**Calub BOCANEGRA, Appellant**

v.

**The STATE of Texas, State**

**NO. 02–15–00198–CR**

Court of Appeals of Texas,
Fort Worth.

DELIVERED: February 16, 2017

Rehearing and Reconsideration En Banc
Overruled March 30, 2017

ATTORNEY FOR APPELLANT: CHRISTIAN SOUZA, DALLAS, TX.

ATTORNEY FOR STATE: SHAREN WILSON, DIST. ATTY., DEBRA WINDSOR, ASST. DIST. ATTY., CHIEF OF POST CONVICTION, EDWARD WILKINSON, MELINDA WESTMORELAND, ASST. DIST. ATTYS., FORT WORTH.

Judgment *has been addressed and refuted.*

## DISSENTING OPINION [1]

SUE WALKER, JUSTICE

### I. INTRODUCTION

A jury found Appellant Calub Bocanegra guilty of the offense of aggravated sexual assault of a child younger than fourteen years of age. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (a)(2)(B) (West Supp. 2016). Because I disagree with the Majority Opinion's conclusions that the evidence is insufficient to support Bocanegra's conviction and the jury's rejection of Bocanegra's medical-care defense, I am compelled to dissent.

### II. FAILURE TO REVIEW ALL OF THE EVIDENCE SUPPORTING BOCANEGRA'S CONVICTION IN THE LIGHT MOST FAVORABLE TO THE JURY'S VERDICT

The Majority Opinion fails to review all of the evidence in the light most favorable to the verdict. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Instead of reviewing the evidence, the Majority Opinion crafts its own unique procedure; the Majority Opinion sets forth the facts recited by the State in its appellate brief in response to Bocanegra's fourth issue and then spends forty-six pages examining the words used by the State in its brief "to determine which of the State's assertions are supported by the record." [2] The Majority Opinion notes any word used in the State's brief that differs from the word used by the witness in the record and, using dictionary definitions and interposing possible innocent inferences from the facts, concludes that a reasonable juror could draw no inferences supporting Bocanegra's guilt from the evidence [3] and that the only evidence supporting Bocanegra's conviction is Amy's outcry.[4] In analyzing whether Amy's outcry is sufficient to support Bocanegra's conviction, the Majority Opinion

---

1. Because in my view the Majority Opinion alters or modifies the existing sufficiency standard of review applicable to a jury's decision to reject a defendant's medical-care defense, I voted to publish both the Majority Opinion and my Dissenting Opinion. *See* Tex. R. App. P. 47.4(a). The two justices reversing Appellant Calub Bocanegra's conviction for the offense of aggravated sexual assault of a child younger than fourteen years of age and acquitting him of that offense have voted not to publish the Majority Opinion. *See* Tex. R. App. P. 47.2(b). Accordingly, to maintain the brevity of my 9–page published Dissenting Opinion while retaining its meaning contextually, I have attached the 102–page unpublished majority opinion hereto as an Appendix.

2. Maj. Op. at 213.

3. *See, e.g.,* Maj. Op. at 213–16 (attacking the State's use of the word "begun"), 221–23 (attacking the State's use of the word "taking" instead of "using"), 225 (attacking the State's use of quotations around the phrase "comforting her"), 225–28 (criticizing the State's repeated use of the "invented phrase"—that Amy "[felt his] finger so far inside her vagina it [made] her belly hurt"— despite that the fact that *Amy* told her mother, her grandmother, and the sexual assault nurse examiner (SANE) that Bocanegra's touching of her "cookie" caused pain in her tummy; thus, *Amy* connected Bocanegra's touching with pain in her tummy). To the extent the Majority Opinion attempts to undermine—by attacking the words used in the State's brief on appeal—the reasonable inferences supporting Bocanegra's conviction that a rational trier of fact could draw from the evidence, such inferences exist regardless of the word choice in the State's brief. To the extent the Majority Opinion holds that the State is required to draft a factual background using only the exact language found in the record, no such requirement appears in the Texas Rules of Appellate Procedure. *See* Maj. Op. at 221 ("By deliberately substituting a different word for the word that actually appears in the record"); *see generally* Tex. R. App. P. 38.1.

4. Maj. Op. at 236.

explains that not "just any outcry will do" [5] and holds this one insufficient because it "puts every parent, grandparent, sibling, daycare worker, or other caregiver of any kind at risk of being imprisoned for performing a basic and necessary function in the care of a child." [6] Although purporting to apply a *Jackson v. Virginia* sufficiency standard of review, in reality, the Majority Opinion fails to consider all of the evidence in the light most favorable to the jury's verdict; instead, the Majority Opinion sets forth its own view of the evidence and then explains the Majority's stance on why it would be unreasonable for the jury to view the evidence differently.[7]

### III. Bocanegra Admitted All of the Elements of the Offense

The Majority Opinion fails to recognize that the medical-care defense is a defense of confession and avoidance; thus, by offering evidence supporting, by requesting, and by obtaining a medical-care defense instruction, Bocanegra admitted every element of the offense but claimed his admitted, otherwise-criminal conduct of penetrating the sexual organ of then four-year-old Amy by inserting his finger was justified based on the provision of medical care. *See, e.g., Villa v. State*, 417 S.W.3d 455, 462 (Tex. Crim. App. 2013) ("The

5. Maj. Op. at 239.

6. Maj. Op. at 239.

7. For example, the Majority Opinion states, "Thus, the jury was not free to speculate that a sexual assault occurred simply because Amy reported that when Bocanegra touched her, 'it hurt.'" Maj. Op. at 223. But Amy did not simply report that when Bocanegra touched her it hurt; Amy reported to three separate people that Bocanegra had touched her "cookie" and that this touching had "hurt her tummy."

8. The "intentionally or knowingly" intent element may be inferred from this admitted con-

medical-care defense is one of confession and avoidance. As such, a defendant claiming entitlement to an instruction on the medical-care defense must admit to each element of the offense, including both the act and the requisite mental state."); *Cornet v. State*, 417 S.W.3d 446, 451 (Tex. Crim. App. 2013) (*Cornet II*) (explaining that "[w]hen the defensive evidence does no more than attempt to negate an element of the offense, a defendant is not entitled to a defensive instruction on any defense subject to the confession-and-avoidance doctrine"); *Cornet v. State*, 359 S.W.3d 217, 225 (Tex. Crim. App. 2012) (*Cornet I*) (holding that medical-care defense does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct).

Bocanegra testified that when he applied cream to Amy's rash, he applied the cream "[e]verywhere where, I guess, where the pee made contact. I guess on her inner thighs almost to her waist, you know, on her 'cookie;' vagina, you know. I—Everywhere." This testimony by Bocanegra constitutes evidence that he penetrated Amy's female sexual organ and was sufficient to entitle Bocanegra to an instruction on the medical-care defense.[8] *See Villa*, 417

duct by Bocanegra. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991) ("Intent may be inferred from acts, words[,] and conduct of accused."), *abrogated on other grounds by Janecka v. State*, 937 S.W.2d 456 (Tex. Crim. App. 1996), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992); *Bazanes v. State*, 310 S.W.3d 32, 40–41 (Tex. App.—Fort Worth 2010, pet. ref'd) (stating "the conduct itself is sufficient to infer intent" and holding that jury could infer intent from victim's testimony). And Bocanegra pleaded "true" before the jury to the special issue— that Amy was under six years of age at the time of the sexual assaults—thus satisfying the remaining element of the offense that the victim was under fourteen years of age at the

S.W.3d at 462 (holding that reasonable juror could infer that appellant's testimony—that he had applied Desitin to the red area outside the vagina and that he had "touched the genitals of this little girl"— was an admission that appellant had contact with victim's labia minora and constituted penetration of her sexual organ, thus entitling appellant to an instruction on the medical-care defense); *Cornet I*, 359 S.W.3d at 226 ("As for 'admitting' conduct under the doctrine of confession and avoidance, it is sufficient that the defendant point to defensive evidence, originating in his own statements, such that a trier of fact could reasonably infer that each element of the offense has been satisfied.").

Because the medical-care defense is one of confession and avoidance, the Majority Opinion's holding—that the evidence is insufficient to support the elements of the offense of aggravated sexual assault but that the evidence is sufficient to support the medical-care defense—is both irreconcilable and contradictory to the law.

## IV. ACCEPTANCE OR REJECTION OF BOCANE-GRA'S MEDICAL-CARE DEFENSE WAS WITH-IN THE SOLE PROVINCE OF THE JURY

In holding that the evidence was "insufficient to support ... rejection of the medical[-]care defense beyond a reasonable doubt[,]"[9] the Majority Opinion fails to defer to the jury's resolution of credibility determinations as mandated by *Jackson v. Virginia. See* 443 U.S. at 319, 99 S.Ct. at 2789; *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (stating that "reviewing court is required to defer to the jury's credibility and weight

determinations because the jury is the **sole** judge of the witnesses' credibility and the weight to be given their testimony"). The jury sent out ten notes during its guilt-innocence deliberations. The notes reflect that before reaching its decision to reject Bocanegra's medical-care defense, the jury requested some of the most pertinent evidence—including the forensic investigator's testimony about the description provided by Amy's mother Mandy concerning what had happened to Amy, the exact outcry statement, the demonstration by the SANE of how Amy had showed her on her fingers that Bocanegra had penetrated her sexual organ, and the SANE's credentials. And ultimately, the jury was free to disbelieve Bocanegra's testimony that his penetration of Amy's sexual organ was not of a sexual nature and was performed as medical care. *See, e.g., Browne v. State*, 483 S.W.3d 183, 195 (Tex. App.—Austin 2015, no pet.) (stating that jury's decision showed that it "clearly ... did not believe" appellant's testimony that he had touched the victim's sexual organ only as a caretaker).

Instead of relying on the credibility decision reached by the jury—to disbelieve Bocanegra's testimony that his conduct in penetrating Amy's sexual organ was not of a sexual nature and that it was instead performed as medical care—the Majority Opinion substitutes its own credibility determination (that Bocanegra is credible) for the jury's credibility determination (that Bocanegra is not credible) and holds the evidence insufficient to support the jury's rejection of Bocanegra's medical-care defense. *But see Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010) ("This Court may not re-evaluate the

time the offense occurred. *See Torres v. State*, 391 S.W.3d 179, 184 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) ("Once a defendant pleads true to the enhancement allegations, the State is relieved of its burden to prove the

allegations because a plea of 'true' constitutes evidence and sufficient proof to support the enhancement allegation.").

**9.** Maj. Op. at 241–42.

weight and credibility of the record evidence and thereby substitute our judgment for that of the factfinder"); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (recognizing appellate courts are ill-equipped to weigh the evidence reflected in a cold record and must ask only whether *any* rational trier of fact could have found essential elements beyond a reasonable doubt, not whether *it* believes that the evidence established guilt beyond a reasonable doubt).[10] In short, the Majority Opinion holds that the jury was required to believe Bocanegra's testimony that when he penetrated Amy's " 'cookie;' vagina, you know," he was providing medical care.

## V. CONCLUSION

Based on the evidence presented at trial, when reviewed in its entirety in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt that Bocanegra intentionally or knowingly caused the penetration of the sexual organ of Amy, a child who was younger than fourteen years of age, by inserting his finger into her sexual organ and also could have found beyond a reasonable doubt against Bocanegra on his medical-care defense. *See*

*Saxton*, 804 S.W.2d at 914; *Williamson v. State*, 356 S.W.3d 1, 15, 17 (Tex. App.— Houston [1st Dist.] 2010, pet. ref'd) (holding evidence sufficient to support conviction for serious bodily injury to a child younger than fifteen years of age and holding evidence sufficient to reject medical-care defense).

For the reasons set forth above, I respectfully dissent; I would affirm the trial court's judgment.

## APPENDIX

### MEMORANDUM OPINION [1]

#### I. Introduction

In the last of his four points, Appellant Calub Bocanegra appeals his conviction for aggravated sexual assault of a child younger than fourteen years of age, challenging the sufficiency of the evidence to support his conviction and the jury's rejection of his medical-care defense. *See* Tex. Penal Code Ann. § 22.011(d) (West 2011), § 22.021(a)(1)(B)(i), (a)(2)(B) (West Supp. 2016). The jury assessed Bocanegra's punishment at the minimum punishment available—25 years' confinement.[2] Because we sustain his fourth point, we reverse the trial court's judgment, enter a judgment of

---

10. *See also Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011) ("[T]he court of appeals, in individually discounting each of the State's arguments, failed to defer to the jury's view of the facts" and "improperly supplanted the jury's verdict with its own view of the evidence, offering alternative, seemingly innocent explanations in certain instances, in direct opposition to the jury's implicit determination in this case."); *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (holding that court of appeals erred in its sufficiency review and in ordering acquittal because additional circumstantial evidence tended to corroborate child victim's outcry and because jury was free to disbelieve recantation); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (reversing court of appeals's judgment of acquittal because de-

fendant's self-defense evidence was merely consistent with physical evidence at the scene of alleged offense so that credibility determination of such evidence was solely within the jury's province).

1. *See* Tex. R. App. P. 47.4.

2. While the punishment range for a first degree felony is usually 5 to 99 years' confinement and up to a $10,000 fine, *see* Tex. Penal Code Ann. § 12.32 (West 2011), § 22.021(e) (West Supp. 2016), because of the child's age at the time of the alleged offense, the minimum punishment was increased from 5 years to 25 years' confinement. *See id.* § 22.021(f) (West Supp. 2016).

acquittal, and do not reach his remaining three points. *See* Tex. R. App. P. 47.1.

## II. General Overview

This case turns on the difference between reasonable inference and speculation, *see Hooper v. State*, 214 S.W.3d 9, 15–17 (Tex. Crim. App. 2007), and the question presented here is whether, under the facts of this case, a four year-old's statement—that her daddy touched her "cookie" [3] and that it hurt her tummy, along with an abstract demonstration that some sort of penetration may have occurred—was sufficient evidence to support a conviction for aggravated sexual assault of a child. We hold that it was not.

In arriving at this conclusion, we are mindful that we cannot expect child victims to testify with the same clarity and ability as is expected of mature and capable adults, lest we condone, if not encourage, the practice of preying upon the most innocent and vulnerable in our society in order to evade successful prosecution. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990). However, this important public policy must be balanced against an equally important, fundamental tenet that a criminal conviction must be established by proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361–62, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970). These cases often present special problems with regard to evidence and proof, but each must be decided under the standard of review set out below and on its own particular facts. *See Villalon v. State*, 739 S.W.2d 450, 454 (Tex. App.—Corpus Christi 1987), *rev'd on other grounds*, 791

S.W.2d at 131–32. With these concerns in mind, we conduct a thorough review of the entire record in considering the State's factual allegations, as set forth in detail in this opinion, in order to apply the proper standard of review.

## III. The Statutes

Bocanegra was charged with having intentionally or knowingly caused the penetration of the sexual organ of Amy [4], a child younger than fourteen years of age, by inserting his finger into her sexual organ. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (a)(2)(B); *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (stating that in a sufficiency review, the court compares the elements of the crime as defined by the hypothetically correct jury charge—the law as authorized by the indictment—to the evidence adduced at trial). It is a defense to prosecution that the charged conduct consisted of medical care for the child and did not include any contact between the anus or sexual organ of the child and the mouth, anus, or sexual organ of the actor or any third party. Tex. Penal Code Ann. § 22.011(d).

## IV. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This standard gives full play to the responsibility of the trier of fact to resolve con-

---

3. The child's mother testified that "cookie" was the word the child used to mean "the private part that she uses to pee."

4. To protect the child victim's privacy, we use a pseudonym for her name and for her mother's name. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel. Op.] 1982).

flicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.*, 99 S.Ct. at 2789; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, —— U.S. ——, 136 S.Ct. 198, 193 L.Ed.2d 127 (2015).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray*, 457 S.W.3d at 448. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49. Notwithstanding the deference we must afford the trier of fact in weighing the evidence, however, the Supreme Court directs us that a mere modicum of evidence cannot meet constitutional muster to support a guilty finding beyond a reasonable doubt. *Jackson*, 443 U.S. at 320, 323–24, 99 S.Ct. at 2789, 2791–92.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Dobbs*, 434 S.W.3d at 170; *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). Likewise, hearsay may be sufficient to support a conviction in some instances even when the declarant testifies at trial and denies the crime occurred. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex.

Crim. App. 1991) (holding that "the complainant's recantation of her videotaped testimony did not destroy its probative value"); *Fernandez v. State*, 805 S.W.2d 451, 456 (Tex. Crim. App. 1991) ("[I]t was up to the [factfinder] to decide which version of [the declarant's] story it believed.").

In a case such as this, the testimony of a child sexual abuse victim alone can be sufficient to support a conviction for aggravated sexual assault. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2016) ("Testimony in Corroboration of Victim of Sexual Offense"); *see also Bazanes v. State*, 310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref'd). Corroboration of the victim's testimony by medical or physical evidence is not required. *Cantu v. State*, 366 S.W.3d 771, 776 (Tex. App.—Amarillo 2012, no pet.).

With regard to Bocanegra's medical-care defense under section 22.011(d), in evaluating the sufficiency of the evidence, we determine whether after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact would have found beyond a reasonable doubt that Bocanegra committed the essential elements of aggravated sexual assault of a child and also would have found against Bocanegra on the medical-care defense beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789). While the credibility determination of defensive evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence, a jury's rejection of a defensive theory must be reasonable, and the defensive theory must be rejected beyond a reasonable doubt. *Id.*

## V. Evidence at Trial

Although trial spanned four calendar days, the presentation of the evidence did

not begin until sometime after 3:00 p.m. on the first day, only lasted from 2:00 p.m. until 3:25 p.m. on the second day, and was concluded well before noon on the third day. Indeed, the jury spent longer deliberating, which occurred during the third and fourth days, than they did listening to the evidence,[5] which was presented as follows:

Amy was born in 2008. She had just turned four years old at the time these allegations arose, and she was almost seven years old at the time of the trial. At trial, she could not remember any of the events relating to the charge of aggravated sexual assault.

Amy was one and a half years old when her mother Mandy became romantically involved with Bocanegra while they were teenagers in high school. At some point during high school, Mandy and Bocanegra began living together, first at his parents' home, and then later at her mother's home. Although Bocanegra, a young man who had never before raised a child, was initially uncomfortable with the task of changing diapers, eventually he joined in the parental functions of bathing Amy, feeding her, and changing her diapers. Other family members also assisted as caregivers to Amy by bathing her, feeding her, and changing her diapers.

Amy suffered from chronic irritation and diaper rashes that were caused by urinating on herself. Mandy consulted Amy's pediatrician on numerous occasions about the problem, and the pediatrician prescribed a cream to be applied to the affected areas.[6] Mandy testified as to how she,

Bocanegra, and other family members would apply the cream by hand, using their fingers to spread the ointment all over Amy's genital area:

A. .... Every time we had to reapply it we had to make sure it was clean to prevent it from getting even worser [sic].

Q. All right. When you say—Can you just describe what you mean when you say you had to make sure the area was clean. You can be very specific about what you needed to do with your child to clean her.

A. Any parent that has a girl knows that you have to make sure you clean between the lips of the vagina area to make sure because whenever you apply a cream it creases up, and if you just leave it there it can cause an infection.

Q. So after you would clean her, then how would you put the cream on?

A. You would apply it with your two—your two fingers, your hand.

Q. Like all over the genital area, you know—

A. It usually would—Because of the diaper, it would be on her, you know, the inside of her thighs. Anywhere from, like, the top to the bottom. Sometimes it would even spread towards, you know, her butt. So sometimes we just put it all over the place just to prevent it from spreading even worse.

Q. Was it ever on the lips of her vagina?

A. Yes.

---

5. During the guilt-innocence deliberations, eight of the ten notes submitted by the jury to the trial judge sought guidance and additional information about the evidence. Most of the notes expressed disagreement among the jurors regarding the substance of the testimony. The fourth note announced that the jury was

"stuck" and requested a recess until the next day, and the tenth note announced that they had "reached a decision."

6. Mandy testified that sometimes she would use the prescription cream; other times she would use over-the-counter creams.

Q. Was it ever inside? You put the medicine inside?

A. Yes.

Q. Okay. And why did you do that?

A. Because it was either irritated from her peeing herself and—well, when we transferred her to underwear and she wouldn't tell us. Or she was in day-care and they wouldn't change her immediately because they wouldn't notice. . . .

According to Mandy, Amy continued to wet herself and experience rashes—necessitating the application of cream on the affected areas—through the time of trial, by which time Amy was in the second grade. In Mandy's opinion, Amy's problem was caused by her choosing to continue to play rather than to stop and go to the bathroom, and Amy would explain to her care-givers when it happened that she "[didn't] remember [she] had to go pee."

According to Mandy, because the cream was applied to an "irritated" and "sensitive" area, sometimes Amy would flinch when it was applied, signaling that she was uncomfortable and that it hurt her. Despite the discomfort Amy experienced during the process, however, Mandy testified that it still had to be done.

After they graduated from high school, Mandy and Bocanegra moved to their own apartment. A year later, Mandy gave birth to their son. A few months after their son's birth, Bocanegra and Mandy separated, and Bocanegra moved out. Shortly thereafter, Mandy married another man.

In December 2012, four or five months after Mandy and Bocanegra separated, Mandy was sitting on the bed brushing then-four-year-old Amy's hair, and Amy told her mother that she was afraid to stay in her room. This, according to Mandy, was not something new, and Amy's attempts to avoid sleeping in her room continued even through trial, two years later. According to Mandy, when she asked Amy why she was scared to stay in her room at night, Amy offered various reasons. Amy would say, "[e]ither it was dark or that—Anything that would get her out of her room to sleep with us." But on this occasion, when Mandy asked Amy why, Amy said that her dad had touched her "cookie" and that "it hurt [her] tummy."

Due to the dynamics of her personal relationship with Bocanegra at that time, having separated from him and married another man, Mandy testified that her first reaction was one of shock and anger. As Mandy explained at trial, she had "just got married and [she and Bocanegra] had just separated . . . and then this came. . . . And then for her to tell me that, it's—it was a lot." A day or two later, Mandy consulted with her mother about the situation, and then she took Amy to Cook Children's Hospital.[7] Cook Children's told Mandy that she needed to file a police report before they would examine Amy, so she took Amy to the police station, and the police took a report, scheduled a medical examination of Amy, and contacted Alliance for Children.[8]

---

7. At trial, the prosecutor took issue with Mandy's delay in reporting the incident, arguing to the jury, "She didn't call the police that day. She told you that she waited several days and talked to her mom and then she went to the police." In December 2012, Mandy was barely twenty years old.

8. At trial, the director of program services for Alliance for Children described the organization as a "nonprofit in Tarrant County" that "work[s] with collaboration efforts with Child Protective Services, with law enforcement, with the district attorney's office, with a specialized team, [and] with Cook's Children's Medical Center called the CARE Team when there's allegations of child abuse."

Mandy ultimately provided a written statement to the police that was not admitted into evidence at trial. At trial, Mandy agreed that in the statement she had stated that during the previous five or six months, Amy was urinating on herself, did not want to sleep by herself, and became upset when Mandy left her alone with Bocanegra, but she also clarified in her testimony that Amy's fear of sleeping in her own room and wetting herself were recurring problems that were not limited to just the five or six months prior to the allegation.

Joy Hallum, who was employed as a forensic interviewer with the Alliance for Children at the time, interviewed Amy. Hallum provided a great deal of testimony regarding her background, the general concepts, principles, and goals regarding child forensic interviews, and the specific procedures she employed while interviewing Amy.

Hallum's testimony was limited to outcry statements related to indecency with a child, the second count brought against Bocanegra, in which the State alleged that he touched Amy's breasts. The jury acquitted Bocanegra of the indecency charge. Nevertheless, we consider Hallum's observations of Amy and Amy's interactions with her during this interview in considering the combined and cumulative force of the evidence as a whole. In this regard, Hallum testified as follows:

Q. And did Amy make a disclosure to you of sexual abuse?

A. She did.

. . . .

Q. What did she tell you with regard to her—the fondling?

A. The fondling of?

Q. Her breasts.

A. Her breasts. When asked if anyone had ever touched—she identified the breasts of her body as her "boobies," and asked if anyone ever touched her there she said "yes." When I asked who, she had identified [Bocanegra].

Q. Did she also call [Bocanegra] "daddy"?

A. She did.

. . . .

Q. You testified earlier that she—Amy reported some type of sexual abuse to you?

A. Yes

Q. Okay. And you asked Amy what position she was in when this happened to her; is that correct?

A. Yes, ma'am.

Q. Okay. And did Amy answer that question?

A. Yes, she did. ·

Q. And did she also demonstrate what type of position she was in?

A. Yes, she did.

Q. Okay. And she did that with her body; is that correct?

A. That is correct.

Q. And then later on you provided her with an anatomical doll; is that correct?

A. Correct.

Q. And you asked her to position the doll in the same position she was in when she was allegedly touched by her father, correct?

A. Correct.

Q. And Amy was—did not put the doll in the same position, correct?

A. Correct.

. . . .

Q. And after she put the doll in a different position than what she demonstrated and told you earlier, she made

you aware that she had not told the truth earlier; isn't that correct?

A. That's correct.

. . . .

Q. . . . Now, you report—You stated earlier that she reported sexual abuse. What was the difference? If someone was to state they were touched, how do you develop that into being sexual—or come to the conclusion that it was sexual abuse?

A. Anytime a child tells me that they are being touched on any private part of their body, whether it be their breasts or vagina or buttocks, or anytime they're being made to touch someone else on their—their—their genitals, that is considered sexual abuse.

Q. Thank you. But in this particular situation there is no indication that Amy was touching anybody else on their genitalia, just to be clear?

A. Correct.

. . . .

Q. Okay. Did you ask if anybody was present?

A. Yes.

Q. Were you made aware that someone other than the perpetrator was present at the time?

A. Yes.

Q. Okay. And Amy told you that, correct?

A. Correct.

. . . .

Q. Okay. And you also asked Amy if this touching was made to her skin or her clothes; is that correct?

A. Correct.

At trial Hallum related no additional information about the contents of Amy's statements—verbal or nonverbal—during the interview, either on the subject of any alleged abuse or any unrelated subject. She did testify as to Amy's age and demeanor, describing Amy as "very energetic" and "developmentally on target," and added that Amy "was a very young four-year-old" who possessed "some sensory [sic] and details about what was going on."

Despite the fact that Amy had admitted to not telling the truth at some point in the interview and that Amy indicated that "someone other than the perpetrator" was present in the room when the alleged abuse occurred, Hallum indicated that she had no "concerns" about the child's interview.[9] Amy's interview was videotaped, but the videotape was not played to the jury or admitted into evidence, and it is not a part of this record.

Brenda Crawford, a certified sexual assault nurse examiner at the Child Advocacy Research Evaluation (CARE) Center at Cook Children's, testified that she obtained Amy's medical history from Mandy and performed a physical exam on Amy in January 2013. Amy's exam produced no findings of sexual abuse, which Crawford testified was common, given the time frame involved and the type of abuse alleged.[10]

As with Hallum, Crawford testified at length regarding her background, the gen-

---

9. When asked, "Did you have any concerns about Amy's interview," Hallum replied, "I did not."

10. Crawford described the lack of findings as "normal," adding that 95% of the exams conducted by the CARE Team are normal, even

when they see a child immediately after abuse has been witnessed or admitted to by the perpetrator. Thus, Crawford characterized "the lack of medical evidence" as "consistent" with what the victim said happened.

eral concepts, principles, and goals regarding CARE exams, and the specific procedures she employed while conducting her examination of Amy. However, with regard to the actual substance of what Amy said or demonstrated during the exam regarding the allegations of abuse, Crawford testified only as follows:

Q. Okay. And did you ask Amy what she called specific body parts?

A. Yes. Amy called her vaginal area "cookie."

Q. Okay. And—and how did you know that was her vaginal area that she was referring to?

A. We have—with children that age, we have dolls that we use for—to show certain parts of the body.

Q. And so when you referred to the vaginal area, she called that a "cookie"?

A. Correct.

Q. Okay. And did you take a statement for Amy or from Amy?

A. I did.

. . . .

Q. So, Ms. Crawford, what statement did Amy make concerning being sexually abused?

A. . . . when I meet with a patient, I always say, "Do you know why you're here?" Sometimes they do, sometimes they don't. I say, "I'm a nurse and I'm here to make sure that your body is healthy, and so we are going to"—we pinpoint the—identify different parts of the body, which, as I said, she named "cookie." And so she said verbatim, "My dad," I asked her what her dad's name is. She said, "Cal[u]b touched my cookie," and she described pain with that.

Q. And did Amy demonstrate what she meant by touched my "cookie"?

A. Yes, she did. We have specific questions that we ask patients and she—

developmentally she was unable to answer these specific questions so for my clarification I said "Okay, Amy, so let's say this is your "cookie" right here, show me with your finger how your dad touched your "cookie" and so she demonstrated penetration.

Q. All right. And for purposes of the record, Ms. Crawford, are you putting, on one hand, your index finger and your middle finger together?

A. That's correct.

Q. To kind of symbolize the female sexual organ?

A. That's correct, sir.

Q. And exactly how did Amy demonstrate her dad touched her "cookie?"

A. She took her finger and she penetrated between the fingers.

Q. And did she tell you whether or not that hurt?

A. Yes. I asked her if it hurt and she described pain with that.

Q. Did Amy tell you how many times she was sexually abused?

A. She said it happened one time.

Q. Okay. And was she able to tell you where the abuse occurred?

A. Yes, sir. She said it happened at the alleged perpetrator's home.

. . . .

Q. Okay. Now, you said that she said, this is exactly what she said, "Daddy touched my cookie," right?

A. Verbatim she said, "My dad"—I asked her what her dad's name was, she said, "Cal[u]b touched my cookie," yes, ma'am.

. . . .

Q. When you did the demonstration, the way that you understood it, the—her finger did not go any further than the labia, [i]t did not go into the vaginal canal, correct?

A. Well, I can't answer that because, once again, we are talking about a four-year-old and sometimes even as an adult, you know, you're in a traumatic— you're talking to a stranger about a traumatic event in your life and you forget details so all I wanted to know was, was that on the outside of the genitalia or on the inside, and she demonstrated—she put her finger between my two fingers.

Q. So you are not testifying that he put his finger in her vaginal orifice at all, correct?

A. Well, I'm a sexual assault nurse examiner, I'm just testifying on my medical exam and my medical protocol and what she said to me.

Q. Again, you're not testifying—you cannot—not—And you are not testifying that he put his finger in her vaginal orifice, correct?

A. Well, what I'm saying is she did demonstrate—even though it goes through the labia majora, it's considered abuse.[11]

. . . .

Q. And I'm not asking that. I'm just asking if you're testifying—can you testify that he—and I understand what you're saying, but can you testify that she indicated she put her finger—that he put his finger into her vaginal orifice?

A. Yes, I am testifying that she demonstrated to me that he put his finger inside of her labia—of her genitalia. Whether it went all the way in, I don't know.

Crawford also testified that when she spoke with Mandy, she was "consistent with what [Amy] had said happened."

Approximately two months prior to trial, Mandy said that she asked Amy about the allegations and Amy had told her something "different," something that gave her "some concerns." Specifically, Mandy testified that at this point she was worried that she was "judging him incorrectly" and that she was "going to put an innocent person away."[12] Mandy contacted the district attorney about the case and requested that the prosecutor administer a lie detector test to Amy.

At trial, the State called into question the propriety of Mandy's having expressed concern about the possibility that Bocanegra might be innocent of the charges. During her testimony, the prosecutor accused Mandy of consulting a tarot card reader and contacting the prosecutor because "[Mandy's] tarot card reader told [her] that the defendant didn't do it." Mandy agreed that she sought guidance from her godmother but denied that her godmother was a tarot "card reader." There is no evidence in this record that tarot cards were involved in any way. Instead, the

11. *See Villa v. State,* 417 S.W.3d 455, 461–62 (Tex. Crim. App. 2013) (stating that the " 'pushing aside and reaching beneath a natural fold of skin into an area of the body not usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact' " (quoting *Vernon v. State,* 841 S.W.2d 407, 409 (Tex. Crim. App. 1992))).

12. Bocanegra's attorney initially asked Mandy if Amy's statement to her gave her "some concerns." When she answered in the affirmative, the attorney followed up with the question, "In what way?" When Mandy began her answer with "She told me—," the State lodged a hearsay objection. And even though the trial judge responded "overruled," Bocanegra's attorney nevertheless directed Mandy not to testify as to what Amy said. Instead, the attorney instructed Mandy to answer "what were your concerns? Not what she said." Thus, the record is silent as to what Amy actually told Mandy that prompted her concern that she was "going to put an innocent person away."

record shows that Amy told her mother something "different," which caused Mandy to experience doubt as to Bocanegra's guilt.

Both sides agree that after Mandy requested the lie detector test, both the prosecutor and Mandy agreed to a second forensic interview of Amy.

Lindsey Dula, director of program services at Alliance for Children, testified regarding her efforts to arrange for Amy's re-evaluation. According to Dula, while Mandy, who was now twenty-two years old, appeared to be cooperative at first, Dula encountered difficulty in making the arrangements. Dula described having to make multiple attempts—"at least four times"—to get the interview set up, and then once it was set up, Mandy did not keep the appointment. When asked how many appointments were missed, Dula did not provide a specific number, but intimated by her answer—"The most recent was on the 17th of April"—that there had at least been more than one. According to Dula, "[W]hen she didn't show up and didn't return any other phone calls, she appeared to not be cooperative after that point." Dula also testified that at some point, Mandy stopped returning her phone calls.

Mandy's apparent lack of cooperation concerned Dula, who stated,

> [W]hen we have circumstances in which a child is recanting or taking their statement back, we want to know that information. If the child has not been abused or if there is conflicting information, we want to find that out. When we have parents that are reporting that a child is recanting, but then don't bring the child in, that's concerning for us regarding if that child is actually recanting or if maybe the caregiver is just saying they are recanting or if the caregiver is then maybe influencing the child to recant, and because the child isn't telling the story how the caregiver wants them to, that that's why they don't bring them in so we can get a chance to talk to them.

According to Mandy, the interview was scheduled twice. When Alliance for Children called the first time, they left a message informing her of the scheduled appointment time but not the address where the interview would be conducted or a telephone number for her to call them back and inquire. Mandy testified that the call came from a "blocked" telephone number and the message indicated only that the interview would be conducted at "the same place [she] went to last time." Mandy did not remember where the interview had taken place two years earlier.[13]

According to Mandy, by the time the agency called her again, she had already missed the first scheduled appointment. A second appointment was then set up, but Mandy testified that she had been unable to keep it because she could not take off of work at the scheduled time. Mandy testified that she expected that they would call her again to reschedule for a third time, but they did not. Although she had been characterized by the State at trial as uncooperative, Mandy also testified that she had asked for Amy to be re-evaluated even prior to that time but that the district attorney had refused.

Bocanegra testified in his own defense. He provided testimony about when and

---

**13.** Dula testified that she did leave a number for Mandy to call her back. With regard to the location of the interview, Dula did not testify that she provided the agency's address in the message she left for Mandy but said that she directed Mandy to come to "the same location she went for the first interview."

how he first began to help out with changing Amy's diapers. He testified that when he and Mandy first became romantically involved and began living together during high school, he provided no help to Mandy when it came to changing Amy's diapers. At the beginning, he explained, he had no experience in changing diapers, but as he became more comfortable, there would be times when Mandy was busy with cooking or something else, and Amy's diapers would need changing, and Mandy would say, "Hey, change the Pamper." After that, he got used to it, became more experienced, and according to Bocanegra, before long, he began doing "everything a dad does"—"[b]athed her, changed her, feed her, play with her, bad dreams, comfort her. She wanted to stay awake, stay awake with her."

Bocanegra testified that when Amy got a rash, he would apply cream to it. He explained that the directions on the cream said to "apply to rash," so he applied the cream wherever the rash appeared, including her inner thighs, almost to her waist, her vagina area, the lips of the vagina, "[e]verywhere"—wherever "the pee made contact." He recalled that at some point, the medication had to be applied twice a day. Bocanegra testified that sometimes it appeared that the medication hurt Amy when it was applied and that she would flinch or jerk because applying the cream was "irritating the rash." Bocanegra postulated that Amy could have misunderstood that the pain was caused from his applying

the cream to the sensitive rash. Bocanegra insisted that he never touched Amy in any kind of sexual way because "[Y]ou're not supposed to. That's not me. That's my baby. I wouldn't do it to a stranger. You know, that's not right."

On cross-examination, Bocanegra testified that he could not say when the rashes stopped, but he testified that they continued after she transitioned from diapers to underwear. No medical records were offered into evidence, but when the State showed Bocanegra a document that the State represented was a medical record from Dr. Carrizales, Bocanegra agreed that the last note he saw about rashes in that record was dated in 2011.[14] When asked how Amy could confuse the touching incident from 2012 with a time when he was applying cream for a rash in 2011, Bocanegra testified that the doctor had given them large tubes of the cream and had instructed them to use the cream if the rash ever returned. At the State's request, using an anatomically correct doll, Bocanegra demonstrated for the jury how he had applied the cream on Amy.

To the prosecutor's question, "[H]ow on earth would that make her feel your finger so far up inside her vagina it makes her belly hurt?"[15] Bocanegra replied, "I don't know." And when the State further pressed about Amy's alleged statement, "What you just showed us, does that match up to what Amy's outcry was?" Bocanegra replied, "I guess not."

14. Mandy testified that Dr. Carrizales's medical records only went through 2011, when Amy was two-and-a-half to three years old, that she had taken Amy to other doctors since 2011, that Amy had rashes when she was four and five years old, and that the last time Amy had a rash on her genital area was a couple of months before the trial, when she was six years old.

15. As will be discussed later, this question, which the trial court allowed over the objection of defense counsel, assumed facts not in evidence by materially embellishing Amy's actual statement—as testified by all witnesses at trial who heard it—about the incident.

Bocanegra agreed at trial that a four-year-old girl would have no knowledge of what it would feel like to have a finger inserted into her vagina unless someone had told her or unless it had happened to her. He also agreed that Amy's words to her mom, the sexual assault nurse examiner, and the forensic examiner "mean something." And although vigorously pressed to do so by the State during cross-examination, Bocanegra refused to characterize Amy as "a liar":

Q. Do four-year-olds make this stuff up?

A. The allegation?

Q. Yes. Do they make this stuff up?

A. I mean, it—

. . . .

Q. "Yes" or "no", do four-year-olds make this stuff up?

A. Putting cream on a rash could hurt her.

Q. That's not what I asked you. I asked you if four-year-olds make this kind of stuff up. I'm not asking you about rashes. I'm not asking you about medicine. I'm asking about the allegation; do four-year-olds make this stuff up?

A. Possibly.

Q. But you told the detective on March of 2013 that four-year-olds don't make stuff like this up, correct?

A. I—I told you I don't really remember.

Q. In fact, your words were, "It's not normal for a four-year-old to make this up." Do you remember that?

A. Well, if you're saying that, I guess it's what I said.

. . . .

Q. Okay. Is [Amy] a liar?

A. I can't say that.

Q. Is [Amy] a liar, "yes" or "no"?

A. I can't say "yes" or "no".

Q. Okay. Well, one of you is lying, so is it you or is it [Amy]?[16]

A. I—I can't—I mean, I can't answer that.

Q. You—you can't answer whether you're lying or whether [Amy] is lying?

A. I mean, nothing was done.

Q. Excuse me?

A. Nothing was done.

Q. So is [Amy] a liar, "yes" or "no"?

A. I can't answer that.

Q. "Yes" or "no", is [Amy] a liar? Is this four-year-old little girl a liar, "yes" or "no"?

A. She could apply it by the thing [sic].

Q. Is she a liar, "yes" or "no"? That's all I'm asking you.

A. That's all I'm telling you. I mean—

Q. Is your answer "yes" or "no"?

A. No.

Mandy and Bocanegra both testified that they were no longer romantically involved at the time of the trial. Mandy, however, admitted that not only had she come to court with Bocanegra but also that she was supporting him. Like Bocanegra, Mandy was aggressively pressed by the prosecution to choose who was lying—Amy or Bocanegra—but unlike Bocanegra, when questioned on that point, Mandy eventually answered "Amy":

16. On appeal, the State abandoned its insistence that someone had to be "lying" in this situation, conceding that the jury was free to "(1) believe Appellant and disbelieve the outcry; (2) believe the outcry and disbelieve Appellant; or (3) believe both and conclude that Appellant administered medication on occasion but also sexually assaulted [Amy]."

Q. Are you calling your daughter a liar?

A. Do you want me to tell you what she told me now?

Q. No. I'm asking you if you're calling your daughter a liar.

A. She does lie.

Q. Are you calling your daughter a liar about what she told you?

THE WITNESS: Can I use my Fifth Amendment?

THE COURT: No, not to that question.

A. It depends what it is that—what me and her talk about because she does lie.

Q. I'm asking you if you are calling your daughter a liar of what she told you in December of 2012. Are you calling her a liar?

A. I'm not calling her a liar, but what has she told the [sic] me now—

Q. [Mandy],—

A. I do believe—

Q. —that's not what I'm asking you. "Yes" or "no" are you calling your daughter a liar?

A. I don't know.

Q. So did she lie to your mom?

A. I don't know what it was she said to my mom. I just know what my mom told me.

Q. Did she lie to your sister?

A. Me and my sister haven't even never spoke about this case.

Q. Did she lie to the forensic interviewer?

A. They never told me what she said—

Q. Did she lie to the nurse examiner?

A. I don't know what happened there. I don't know what they did or—

. . . .

Q. So let me ask you a question. Who's lying, him or your daughter? Pick one, [Mandy]. Who's lying? Tell this jury which one of you are lying?

A. You are!

Q. Ma'am, are you—is he lying or is [Amy] lying? That is the question. Which one of those two people are lying? Tell the jury which one is lying. Pick a side. Tell them.

A. Well, when I told you "Can I tell them what my daughter told me" you're like, "I can't use that," but you're like "[Mandy], I'm trying to help you out because I want to find out the truth."

[PROSECUTOR]: Objection. Non responsive.

THE COURT: Ma'am, you need to answer the question.

A. I don't have an answer.

Q. [BY PROSECUTOR] You don't know who's lying?

A. Isn't that why we're here?

Q. So you're going to look at this jury and tell them that you—someone is not telling the truth. Is it [Bocanegra] or is it your child?

A. Truth about what? You're not being specific. My daughter—I've caught her in several lies. She's a child.

Q. [Mandy], [Amy] said that her daddy stuck his finger so far up her "cookie" that it made her belly hurt—

[DEFENSE ATTORNEY]: Objection.[17]

. . . .

17. After lodging the objection, the defense attorney went on to explain the basis of her objection, i.e., that there was no evidence in the record of the statement that "her daddy stuck his finger so far up her 'cookie' that it made her belly hurt."

THE COURT: You'll have an opportunity to redirect. Ask the question.

Q. [BY PROSECUTOR] The statement that [Amy] made that you testified, which was in your statement of her outcry statement was that he stuck his finger in her "cookie" and it made her belly hurt. So I'm asking you who is lying, your daughter or the defendant? Which one of them is lying?

A. What I know now—

Q. No, [Mandy], answer the question. Who is lying? Pick one. Tell us. Tell us who's lying.

A. Now that I've spoken to my—

Q. [Mandy]—

A. —daughter, she—

Q. [Mandy]. No.

A. My daughter. My daughter.

Q. No ma'am. I'm asking you the question.

A. Well, aren't you saying to answer to them—

Q. [Mandy], no.

A. That's what I'm doing.

Q. You tell us if [Amy] is lying or the defendant is lying. I'm not asking you to give us a narrative. I'm asking you to answer the question. You don't get to give a narrative. Who is lying?

A. [Amy].

Q. Okay.

[PROSECUTOR]: I pass the witness.

Although she eventually answered "Amy" in response to the prosecutor's repeated questioning, Mandy also clarified that she was not calling her daughter a liar but rather believed that Amy had misunderstood or misinterpreted what happened to her:

[BY DEFENSE COUNSEL]:

Q. So you were forced to give an answer to that?

A. Yes.

Q. But do you feel as though your child was lying or she might have misunderstood what happened to her?

A. I think she misunderstood what happened to her.

There is no evidence in the record of what it was that Amy later said that led her mother to this conclusion, but the above testimony provides evidence that Amy said *something* to her mother that caused Mandy to reconsider the allegations.

Amy was six years and ten months old at the time of the trial. Her testimony was brief. She testified to her name, her age, where she went to school, what grade she was in, her favorite movie, and her favorite color. Amy demonstrated that she understood the difference between the truth and a lie, and she testified that "bad stuff is coming" when someone tells a lie. She described who she lived with, identified her family members, and responded, "Calub" when asked "[w]hat's your daddy's name?" When the State asked her the last time she saw Bocanegra, Amy provided inconsistent answers:

Q. When's the last time you got to see [Bocanegra]?

A. When I was three.

Q. When you were three. You haven't seen [Bocanegra] since you were three?

A. (Witness moves head up and down.)

Q. [Amy], remember what we talked about. You have to tell me things that really happened, remember? Did you tell me earlier that you get to see [Bocanegra] all the time?

A. Uh-huh.

Q. So when is the last time you got to see [Bocanegra]?

A. When I was little.

When asked the general question of whether her mom had "talk[ed] to [her]" before she came to court that day, Amy answered "yes." But when asked if Mandy told her "what [Amy was] going to talk about," and if Mandy told her "what to say," Amy said "no."

As to the allegations of sexual assault by Bocanegra—a subject broached by both the prosecutor and the defense attorney during their examination of her—Amy provided no evidence at all. On direct examination by the prosecutor, Amy testified as folllows:

Q. Do you remember something that you told your mommy when you were four years old?

A. No.

. . . .

Q. Okay. [Amy], I'm going to show you these two dolls. Can you point to which doll is more like you. Can you touch it for me?

A. [Witness complies.]

[PROSECUTOR]: For the record, the witness is pointing to the female anatomical doll.

Q. Why is this doll more like you, [Amy]?

A. Because I'm a girl.

After identifying various body parts on the doll, Amy also identified the doll's "butt" and testified that the "butt" was used "to go to the bathroom." She also identified another body part that was used to "pee" from. The direct examination then continued:

Q. Pee. So you don't have a name for this?

A. Huh-uh.

Q. Okay. Did you tell me at lunchtime that you called this your "cookie"?

A. Huh-uh.

Q. You didn't tell me that?

A. (Witness moves head from side to side.)

Q. Okay. [Amy], did you ever talk to your mom about [Bocanegra] sticking his finger in your "cookie"?

A. Huh-uh

Q. Have you and your mom talked about this?

A. Huh-uh

Q. When is the last time you talked to your mommy about this?

A. I don't know.

Q. Do you remember?

A. Huh-uh

Q. Okay. When is the last time you talked to [Bocanegra] about this?

A. I haven't.

. . . .

Q. [Amy], are you telling the truth?

A. Huh-uh.

Q. Did your—did your mommy talk to you before you came up here?

A. No.

Q. Does mommy get upset about [Bocanegra]?

A. Yeah.

When questioned by the defense attorney, again Amy provided no evidence regarding the allegations:

Q. [Amy], did you talk to this lady, her name is Melinda who just spoke with you, you talked with her at lunchtime today?

A. Yeah.

Q. Okay. And did she show you any video or anything or did you just talk?

A. Just talked.

Q. Okay. And do you remember when you were four years old and you went to talk to a lady who showed you dolls like that?

A. No.

Mandy admitted that even though the conditions of Bocanegra's bond restricted his contact with Amy,[18] Amy had seen Bocanegra during the months leading up to the trial. Bocanegra admitted that when he got out of jail in June 2013, the conditions of his bond required him to not have contact with Amy. He testified that although he tried to respect the court's orders, it was too difficult because he missed Amy and Mandy told him that Amy missed him. Even though he admitted he knew it was wrong, approximately a year later, he began seeing Amy at family gatherings under the supervision of other adults. He admitted that he gave Amy a dollhouse for Christmas, and he admitted that he had seen her as recently as two weeks prior to trial.

## VI. Summary of Sufficiency Argument

In his fourth point, Bocanegra complains that there is insufficient evidence to support his conviction for aggravated sexual assault of a child and the jury's rejection of his medical-care defense.

Relying on *Hooper*, Bocanegra's attorney argues that the jury's guilty verdict and the jury's rejection of the medical-care defense were based on "inference-on-inference speculation" and that the evidence that the State submitted at trial was "mere theorizing or guessing about the possible meaning of facts." Consequently, counsel argues, the jury reached its conclusions using impermissible inferences, rather than reaching a conclusion "by considering the various facts and deducing logical consequences."

As the State correctly points out, there is no bar in the law to "inference stacking." A factfinder is permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *See Hooper*, 214 S.W.3d at 15. But as the court of criminal appeals also points out in *Hooper*, there is a difference between inferences and speculation:

Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences.... [A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

As stated above, juries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation. Without concrete examples, it can be difficult

---

18. Mandy testified that she believed that Bocanegra was forbidden to have unsupervised visits with Amy. Outside the presence of the jury, the trial judge took judicial notice of the conditions of Bocanegra's bond, including "no contact with the complainant in this case and no unsupervised contact with any child under 17 years of age unless otherwise ordered by a district court." Bocanegra's defense attorney's suggestion that supervised visitation with Amy was permitted by virtue of the family district court's order giving Bocanegra standard visitation of Mandy and Bocanegra's son, with the condition that contact with anyone under the age of 17 must be supervised, was rejected by the trial court, and the trial court later revoked Bocanegra's pretrial bond and held it to be insufficient based on his contact with Amy.

to differentiate between inferences and speculation, and between drawing multiple reasonable inferences versus drawing a series of factually unsupported speculations . . . .[19]

Inference stacking is not an improper reasoning process; it just adds unnecessary confusion to the legal sufficiency review without adding any substance. Rather than using the language of inference stacking, courts of appeals should adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.

*Id.* at 15–17. As Bocanegra's attorney points out, the problem here is not so much that inferences were stacked upon inferences, but that speculation was stacked upon inferences. And, as the court of criminal appeals instructed in *Hooper*, while a conclusion based upon speculation may not be unreasonable, "it is not suffi-ciently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* at 16.

In a nutshell, at trial, the State's theory of the case centered on the argument that the onset of urinary problems and the child's fear of sleeping by herself began during the same time period when the outcry was made, thus evidencing that the child was the victim of sexual abuse. The State argued that the evidence was fabricated regarding the child's ongoing and recurring urinary problems and diaper rashes pre-dating the allegations against Bocanegra and that Bocanegra and Mandy were in collusion and were not "standing up for [Amy]" as they should.

In its closing statement, the State characterized Mandy as "a horrible, horrible mother" and "a complete liar." The prosecutors argued that there were only two possible scenarios—that Mandy either coached Amy to make a false allegation at the time it was made or Mandy coached Amy to testify that she did not remember anything at the time of trial—and asked the jury to decide which.[20]

19. The court provided the following as a "concrete example,"

This hypothetical might help clarify the difference. A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking). Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation. But, what if there is also evidence that the other guns in the room are toy guns and cannot shoot bullets? Then, it would be reasonable to infer that no one with a toy gun was the shooter. It would also be reasonable to infer that the woman holding the smoking gun was the shooter. This would require multiple inferences based upon the same set of facts, but they are reasonable inferences when looking at the evidence. We first have to infer that she shot the gun. This is a reasonable inference because she is holding the gun, and it is still smoking. Next, we have to infer that she shot the person on the floor. This inference is based in part on the original inference that she shot the gun, but is also a reasonable inference drawn from the circumstances.

*Hooper*, 214 S.W.3d at 16.

20. There is no evidence of "coaching" in this record. And, of course, this argument ignored at least one other possible scenario—a scenario involving no nefarious conduct on Mandy's

The State's theory is no different on appeal. In its brief the State provided us with a recitation of the facts that represent the evidence supporting—and cast in the light most favorable to—the verdict. Using the *Jackson* standard and with the guidance of *Hooper*, we will examine all of the evidence, using the facts as set forth by the State as a guide to determine the sufficiency of the evidence to support the verdict here.

## VII. Viewing the Facts in Light Most Favorable to the Prosecution

In its brief, the State tells us that the facts,[21] in the light most favorable to the verdict, are as set out in the following eleven paragraphs from its analysis of the sufficiency issue:

[Paragraph 1] Sometime in late 2012, [Mandy] noticed that her daughter was having "some trouble." [RR III–211, 226–27, 225, 230]. The four-year-old girl was experiencing difficulty sleeping and had begun urinating on herself "all the time." [RR III–211, 226–27, 230–31, 233] [Mandy] took the child to the doctor several times for treatment. [RR III–231].

[Paragraph 2] Finally, on December 16, 2012, [Amy] revealed what was bothering her. [RR III–232,252] As she sat on the bed as her mother brushed her hair, she confessed that she was afraid to sleep alone in her bed. [RR III–232] When [Mandy] asked why, the little girl confessed that she was "scared" about her "dad touching her." [RR III–234]. The child disclosed that Appellant had put his finger in her "cookie"—the word she used to describe her vaginal area—and that "it hurt her tummy." [RR III–234–35] [Mandy] recalled that [Amy] had often gotten upset, urinated on herself, and had refused to sleep by herself, when left alone with Appellant. [RR III–235–36]. To be sure of whom the child was speaking, [Mandy] mentioned several other persons to [Amy], but the little girl maintained "it was no one but" Appellant. [RR III–236] [Amy] later repeated her outcry to her grandmother. [RR III–269].

[Paragraph 3] "Shocked and mad," [Mandy] took [Amy] to Cook Children's Hospital several days later, after talking to her own mother, the child's grandmother. [RR III–254, 270] [Mandy] was informed that the hospital could not perform an exam until after a police report had been filed. [RR III–253–254] [Mandy] did not take the child to the police station for another day or two, however, and a medical examination at the hospital was not performed for another

part—that when Bocanegra touched the four-year old's vaginal area while applying cream to her diaper rash, the application of that cream to the sensitive area caused the child pain; that the child later recalled this incident to her mother, who became concerned and related this information to the authorities; that upon later reflection, Mandy became concerned that Bocanegra had been wrongfully accused of a crime he did not commit; and that by the time of trial three years later, the child had completely forgotten about the incident.

21. The State began its factual summary with this paragraph,

> Appellant and [Mandy] had known each other since grade school, but did not become romantically involved until 2010. Appellant soon moved in with [Mandy] and [Amy], her daughter by a prior relationship. The couple had a son in early 2012, but by mid-summer Appellant moved out. Over the almost two years he lived with them, [Amy], who was born on [redacted date], began to refer to Appellant as "daddy."

These facts, as set out above in our own recitation, are undisputed.

month. [RR III–254, 269, 282–83; IV–16, 31].

[Paragraph 4] The child nevertheless repeated to the nurse examiner what she had told her mother and grandmother: that her "dad"—whom she specifically identified as "Caleb"—had "touched my cookie"—which, using an anatomically correct doll, she again identified as her vaginal area. [RR IV–17–19, 27]. [Amy] also demonstrated how Appellant had penetrated her using her hands and fingers. [Footnote omitted.] [RR IV–19–20, 28–29]. She recounted that it hurt; that it had happened only one time; and that the assault had occurred at Appellant's home. [RR IV–20].

[Paragraph 5] DNA samples were not collected because [Mandy] had reported that the latest the assault could have transpired was "sometime in November, 2012," two months prior to the exam. [RR IV–21–22]. She also reported that [Amy] wet the bed, but not that the child had accidents during the day, though she was asked about it. [RR IV 26–27]. Nor did she indicate that the child was using any medications. [RR IV–26; V–69].

[Paragraph 6] A physical examination failed to uncover any physical signs of abuse, but given the child's age, the delay in the examination, and the type of abuse reported, the lack of findings was "normal"; indeed, it is so "common" that no physical findings are revealed under such circumstances that 95 percent of documented abuse cases—when the abuse has been witnessed or the abuser confessed—report similar findings. [RR IV–21–23]. The nurse examiner further observed that the hymen of a four-year old girl "is very thin" and taut, so that even if penetration "did not actually go through the hymen," pressure on it "would be painful to the child." [RR IV–23–24]. [Mandy] did not report the presence of a rash on [Amy] to the nurse examiner, and the nurse examiner did not report seeing one on the child. [RR IV–20; V–35, 76].

[Paragraph 7] Appellant testified that during the time he lived with [Mandy] and [Amy], he took over the role as the child's father, and as a consequence performed such parental chores as changing her diapers, feeding her, bathing her, playing with her, and "comfort[ing] her." [RR V–24, 26]. The little girl developed rashes, he explained, as a result of not being potty-trained, and he therefore had to apply prescription cream on her legs, buttocks, inner thighs, and her vaginal area to treat it. [RR V–26–27]. He applied the medicine, he testified, "pretty close to going inside [the child's vagina], like, right on the outside and waistline, and inner thighs and all that." [RR V–49]. He denied, however, ever touching the girl "in any kind of sexual way," and maintained he would "never" do that. [RR V–31].

[Paragraph 8] Asked on cross-examination to demonstrate how he applied the cream, Appellant showed the jury on an anatomically correct doll [RR V–36–37]. He could not explain how what he had demonstrated would have made [Amy] "feel [his] finger so far inside her vagina it [made] her belly hurt," and conceded that what he showed the jury "does not match up to what [Amy's] outcry was." [RR V–36–37]. He also claimed he could not remember whether he had told detectives investigating the complaint that he had applied medicine to the child's vagina, though he acknowledged that it would have been important to tell them. [RR V–37–38]. He declined to review the tape of the detective's

interview to refresh his memory. [RR V–37–38].

[Paragraph 9] Both Appellant and [Mandy] admitted that they had gotten back together shortly after Appellant's arrest; that [Mandy] had visited Appellant while he was in jail; that [Mandy] sent Appellant pictures of both children; and that they had remained in contact and had seen each other a number of times since Appellant had been released on bond. [RR III–237–38, 244, 248–50, 271; V–39–42, 53–54]. [Mandy] went so far as to maintain that she "supported" Appellant through the trial, and admitted that she had accompanied him to the courtroom the first day of trial, sat next to him, and each day after trial she had waited for him outside the courtroom. [RR III–273; V–40, 71].

[Paragraph 10] [Mandy] also acknowledged that she had asked prosecutors to give [Amy] a polygraph test and to re-interview her, yet she had repeatedly missed appointments with prosecutors and a forensic interviewer so they could talk to the child. [RR III–250–51, 265–66, 272; IV–35–37]. She acknowledged that the prosecution had to subpoena her to appear at trial. [RR III–251]. [Mandy] declared that she did not believe her daughter and she did not think that Appellant was guilty. [RR III–262, 268]. She added on direct examination during the defense case-in-chief that Appellant paid child support for their son "right out of his paycheck." [RR III–276].

[Paragraph 11] More importantly, both [Mandy] and Appellant confessed that, in violation of Appellant's bond condition, Appellant had seen [Amy] on a number of occasions, including Christmas, when he had given her a dollhouse; a trip to Six Flags over the summer; a

visit to [Mandy's] old school; a fishing trip; "parties"; dinner at a Chili's restaurant; and "whatever she wanted to do." [RR III–237, 248–50, 271–72; V–27–23, 30–31, 41–42; State's Ex. 1]. Appellant admitted that he had visited [Amy] only two weeks before trial. [RR V–39–40]. [Mandy] further testified that the last time she had received a note from school informing her that [Amy] had wet herself had been two weeks before trial—about the same time [Amy] saw Appellant. [RR V–62, 64–65].

While we agree that the State's recitation of the facts, as set forth above, is crafted in a light favorable to the verdict, the standard of review does not permit us, in casting the proper light, to distort or mischaracterize the facts. As we will discuss below, some of these "facts" are not facts at all.

Some of the State's facts are not based upon a plain reading of the record. Some of the emotionally-charged language employed by the State in its recitation does not appear in the record. Other statements of fact are actually misstatements of the evidence. And our review of the record reveals that—despite the facially apparent strength of the evidence as recited by the State—the actual combined and cumulative evidence here is so weak that it creates only a suspicion of wrongdoing and, as such, cannot support the jury's guilty finding or its rejection of the medical-care defense beyond a reasonable doubt.

In considering the combined and cumulative strength of the entire record, we have reviewed each of the State's factual statements and record references to determine which of the State's assertions are supported by the record.

## A. Review of the State's Evidence—Paragraph 1

*Sometime in late 2012, [Mandy] noticed that her daughter was having "some trouble." [RR III–211, 226–27, 225, 230] The four-year-old girl was experiencing difficulty sleeping and had begun urinating on herself "all the time." [RR III–211, 226–27, 230–31, 233] [Mandy] took the child to the doctor several times for treatment. [RR III–231].*

### 1. The timing of Amy's urinary "trouble."

The central theme of the State's case against Bocanegra was that the onset of Amy's urinary problems and her fear of sleeping by herself began during the same time period when the outcry was made. The prosecutor argued explicitly at trial, and the State argues implicitly on appeal, that the onset of these two problems evidenced that Amy was the victim of sexual abuse.

But Mandy never testified that the "trouble" her daughter was experiencing was that she "had *begun* urinating on herself 'all the time'." [Emphasis added.] She was asked, "At some point did you notice that Amy was having some troubles?", to which she answered "Yes." However, in the testimony that followed, Mandy did not say that Amy "had *begun* urinating on herself," as the State contends, but instead testified, "she'd pee on herself *again*." [Emphasis added.] Mandy's use of the word "again" indicates that this was not the first occasion when this "trouble" occurred, but rather that it had occurred before as well. *See* Webster's Third New International Dictionary 39 (2002) (including one of the definitions of "again" as "another time," "once more," and "anew").

Even disregarding the unambiguous meaning of the word "again," Mandy's testimony at this juncture was consistent with the evidence throughout trial that Amy—from early childhood and continuing through grade school—had had a serious and recurring problem with urinating on herself and bedwetting, resulting in rashes in her genital area that necessitated the application of cream to the affected areas during diaper or clothing changes. For example, Mandy testified as follows:

Q. Okay, Now, the district attorney had asked you about her—her wetting on herself, right?

A. Yes.

Q. This is something—can you tell us about when this started?

A. *Since she was little until now because she still does.*

Q. And this is something that you have seen the pediatrician about?

A. Several times. [Emphasis added.]

No evidence contradicted the testimony that Amy's urinary problem started early in her lifetime and continued through the day of trial. During trial the State itself made references to medical records that corroborated the existence of urinary problems in 2011, prior to the allegations here. So, contrary to the State's characterization of the facts, there was no evidence in this record that the child had *"begun* urinating on herself" in late 2012. [Emphasis added.]

### 2. The timing of Amy's sleeping "trouble."

The same is true with regard to the State's contention that the child "was experiencing difficulty sleeping." While Mandy answered "yes" to the question, "Was she having trouble sleeping?", the evidence in the record is undisputed that this problem was not one of sudden onset either. Mandy testified that Amy was "scared" of "sleeping by herself" and that the fear of sleeping in her room at night was not

something new, but rather a phenomenon that began before the allegations against Bocanegra were made. As with the urinary problems, it was a problem that continued through trial. And, according to Mandy, in the past Amy had offered other reasons, unrelated to Bocanegra, about why she did not want to sleep alone—"anything that would get her out of her room to sleep with us."

Thus, the State's contention at trial and suggestion on appeal that Amy's trouble with sleeping alone was somehow related to the outcry in December 2012 is unsupported in the evidence.

### 3. The timing of Mandy's seeking medical treatment.

Finally, the placement of the statement, "[Mandy] took the child to the doctor several times for treatment," immediately following the contentions that Amy had suddenly started experiencing urinary and sleep problems, implies a timeline of sudden urinary and sleep trouble, followed by several visits to the doctor. There is a difference between viewing the facts in the light most favorable to the verdict and viewing the facts through a false lens. Even if the State did not intend to imply this sequence of events, we must address whether the evidence would support an inference that the events did unfold in this temporal order.

Once again, the record does not bear this out. The undisputed testimony at trial was that the child had been seeing a doctor for rashes caused by her urinary problems for several years and that these visits to the doctor were not isolated to the timeframe during which the allegations against Bocanegra were made. In fact,

when pressed by the State to admit that the urination problem, the sleeping problem, and the doctors' visits coincided with the time in which allegations were levied against Bocanegra in this case, Mandy refused to so testify:

Q. And you had also testified that she had been having these problems for a long time. But do you recall in your statement you actually said for the past five or six months she's been peeing all over herself and scared to sleep in her bed?

A. She's always—You go to her doctor she'll tell you I've tooken [sic] her several times because of that.

Q. That's not what I'm asking you. I'm asking you if that's what you said in your statement; that five or six months prior to the time you gave your statement is when she started peeing on herself?

A. Maybe again, but I'm sure she had done it—She probably stopped for a period and was doing it before.

Q. What did you say in your statement?[22] I'm not going [sic] asking you to add onto that. I'm just asking you if that's what you put in your statement?

A. Yeah. It says she started at five or six months before *again*. [Emphasis added.]

Through use of the word "again," the record demonstrates that from the time of Mandy's original statement in 2012 until trial, Mandy consistently indicated that these problems were not of recent onset. *See* Webster's Third New International Dictionary 39 (2002) (defining "again").

Thus, despite the State's strong desire for its version of the sequence of events to be indulged when viewing the evidence in

---

**22.** The "statement" referenced by the prosecutor and Mandy during this testimony was

not offered or admitted into evidence.

the light most favorable to the verdict, there simply is no evidence in the record that would allow us to do so. To infer guilt based upon the assumption that the initial onset of urinary problems and Amy's reluctance to sleep alone coincided with the same time period that the allegations of the sexual assault arose would require us to disregard undisputed and consistent evidence and substitute in its place mere speculation that a different sequence of events, wholly unsupported in the record, occurred. *See Rodriguez v. State*, 454 S.W.3d 503, 508 (Tex. Crim. App. 2014) (holding that while a jury is allowed to draw reasonable inferences, it cannot simply speculate or theorize about the possible meaning of the evidence (citing *Hooper*, 214 S.W.3d at 15)).

## B. Review of the State's Evidence—Paragraph 2

*Finally, on December 16, 2012, [Amy] revealed what was bothering her. [RR III–232,252] As she sat on the bed as her mother brushed her hair, she confessed that she was afraid to sleep alone in her bed. [RR III–232] When [Mandy] asked why, the little girl confessed that she was "scared" about her "dad touching her." [RR III–234]. The child disclosed that Appellant had put his finger in her "cookie"—the word she used to describe her vaginal area—and that "it hurt her tummy." [RR III–234–35] [Mandy] recalled that [Amy] had often gotten upset, urinated on herself, and had refused to sleep by herself, when left alone with Appellant. [RR III–235–36].*

Viewing the evidence in the light most favorable to the prosecution does not mean that we are free to mischaracterize the

evidence in considering its sufficiency to support a guilty verdict. The statement, "Finally ... [Amy] revealed what was bothering her," though artfully worded, mischaracterizes the testimony at trial. This statement, read in conjunction with the sentences that precede and follow it, suggests that at the time of the outcry, Amy and her mother were discussing what had been bothering Amy and that as a result of the conversation, Amy revealed the answer, "confessing" that she was "scared" about "her dad touching her." This recitation further suggests that the child's outcry shed light on Mandy's prior concern about what had been bothering Amy, why she was upset, why she urinated on herself, and why she had trouble sleeping alone. And, finally, as presented, the State intimates that Mandy—upon hearing the outcry—connected these dots.

Yet Mandy never testified that the events unfolded as the State suggests, nor did she testify that she made any causal connections between Amy's outcry and any other behavioral issues. No witnesses—including Nurse Crawford and Hallum, the forensic interviewer—made such a connection at trial. Thus, although certainly cast in a light favorable to the verdict, the evidence simply does not go so far as the State would suggest.

The entire body of evidence on this point was developed during Mandy's testimony. She testified that she was sitting on the bed brushing Amy's hair. At some point, Amy began talking "about her dad and being scared and her dad touching her." But there is no evidence in the record to support the State's suggestion that the two had been discussing what had been "bothering" Amy prior to Amy's statements.[23]

---

**23.** During final argument at trial, the State went further, not by merely suggesting, but by

actually embellishing with facts that do not appear in the record:

In fact, Mandy described Amy's demeanor as "normal," and she did not testify that Amy told her that she was scared of her dad or that she was scared of her dad touching her. Mandy was asked,

Q. Did she talk to you about being scared?

A. Yes.

Q. What did she tell you she was scared about?

A. Uh, sleeping by herself.

Q. Because why?

A. Uh, well—I don't know.

When further pressed, Mandy—referring, as directed by the prosecutor, to a statement that was not admitted into evidence—responded, "[d]oesn't specify about why she was being scared. It just says, 'and her dad.' She just started going off about her dad and being scared and her dad touching her."

As the State accurately points out, Mandy testified that on this occasion Amy told her that Bocanegra had put his finger in her "cookie," and, when asked if Amy described what it felt like, Mandy testified that Amy told her "it hurt her tummy." However, the following statement, "[Mandy] recalled that [Amy] had often gotten upset, urinated on herself, and had refused to sleep by herself, when left alone with

> [Amy]'s getting out of the shower and her mom's talking to her about why she won't go to sleep, why she won't sleep in her own bed. And she finally gets the courage to tell her mom that he stuck his finger in her vagina and it made her tummy hurt. [Emphasis added.]

On appeal, the State does not go so far as to represent that these events actually transpired as characterized at trial, but the State's rendition of the facts does suggest that this is how it happened, even though, as discussed above, the record does not bear this out.

Appellant," was not something that Mandy testified was a part of her thought process at the time of the outcry.[24]

When questioned on this very point, Mandy expressly refused to agree with the prosecutor's suggestion that she "notice[d] any behavior" during the relevant time period in which "[Amy] would act differently if [Mandy] would leave [Amy] with the defendant." When further pressed regarding whether Amy acted differently when left with Bocanegra, Mandy was asked to "refer to your statement at the very end," and Mandy responded simply, "I put 'she would cry.' " [25] Urged further to admit that she had said that Amy would "pee on herself and she wouldn't want to sleep by herself when you would leave her by herself with him," Mandy denied this, testifying, "No, I didn't say anything about her sleeping when it was—when it came to her—to leaving her with him."

In the light most favorable to the verdict, but without mischaracterizing the evidence, the facts show only that on December 16, 2012, while Mandy was brushing her hair, Amy told Mandy that Bocanegra had put his finger in her "cookie," a word she used to describe her vaginal area, and that "it hurt her tummy." She later repeated this statement to her grandmother.

24. At trial Mandy agreed with the prosecutor that Amy had experienced problems with urinating on herself, not wanting to sleep by herself, and being upset when she was left alone with Bocanegra during the six-month period prior to Amy's outcry. But Mandy did not testify that these were new behavioral developments, nor did she testify, as the State suggests, that at the time Amy made the outcry, she "recalled" this.

25. Mandy did not explain the context in which her statement, "I put 'she would cry,' " was made or whether it was made in response to a specific question.

With regard to the issues of urinating, sleeping, and crying, this evidence proves only that during this timeframe—five months after Mandy and Bocanegra had separated—Amy's past problems with urinating on herself and refusing to sleep by herself were still ongoing and, further, that she would cry when Mandy left her with Bocanegra.

That Amy continued to urinate on herself and balk at sleeping alone is not incriminating, absent some evidence that these behaviors somehow indicate that a sexual assault has occurred. No such correlation is provided in the evidence of this case,[26] nor could a jury reasonably infer that any such correlation exists on the facts as set out in this record.[27]

Likewise, why a child would cry when her mother leaves her with another person—even another relative or parent—is subject to any number of possibilities, all of which are speculative in the absence of additional, contextual evidence. This record contains no contextual evidence from which a reasonable inference could be drawn as to the significance of Amy's reaction to being separated from her mother. There is no evidence that this was unusual behavior for Amy or, for example, that she did not also cry when Mandy left her with other adults such as her grandmother, her aunt, or a baby-sitter. Without any evidence that this four-year old's crying upon separation from her mother was unusual behavior, a jury could not infer any partic-

ular reason why Amy would cry when her mother left her with Bocanegra. *See McKay v. State*, 474 S.W.3d 266, 271 (Tex. Crim. App. 2015) (holding that "it takes too great a leap of logic" to assume—without more evidence—that because a child is usually under the mother's feet while she cooks that she would also have been under the feet of any other caretaker).

Amy's wetting herself, fearing sleeping alone at night, and crying upon separation from her mother are without a doubt facts in this case. But without some evidence that a correlation should exist between these behaviors and the occurrence of sexual assault, it is insufficient to support a guilty verdict for that crime. Though they were strongly urged to do so by the State, the jurors were simply not free to indulge in this speculation. Nor are we.

## C. Review of the State's Evidence—Paragraph 4

*[Amy] also demonstrated how [Bocanegra] had penetrated her using her hands and fingers. [Footnote omitted.] [RR IV–19–20, 28–29].*

There is no evidence that Amy used her hands to demonstrate anything. To the extent that this overstatement of the record suggests that Amy provided a great deal of sensory detail with her outcry, the evidence does not bear this out. Nurse Crawford testified that Amy used her finger—singular, not plural—to demonstrate

---

26. There is no evidence in this record, expert or otherwise, of any causal or logical connection—or even a bare correlation—between a child's wetting herself or expressing fear of sleeping alone and the occurrence of sexual abuse.

27. Nevertheless, at trial the State strongly suggested that the jury should engage in this speculation. This impermissible leap of logic

was so important to the State that it was chosen as the final thought to be conveyed to the jury before it adjourned to begin its deliberations:

> Do you think it's a coincidence that she's still having problems and she's still urinating and she still has genital rashes? The only common denominator in this is that man."

how Bocanegra "touched" her and that she did not provide "details," either verbally or nonverbally, in her demonstration.

Essentially, Nurse Crawford testified that because Amy could not answer specific questions about the alleged abuse, she showed Amy her own index and middle fingers pressed together to "symbolize" the "cookie." She then asked Amy to show her what happened, and Amy used her finger to "penetrate[ ] between" Nurse Crawford's two fingers.[28] Nurse Crawford did not testify that any hands were used. Nor did she testify that Amy used multiple fingers in her demonstration. And Nurse Crawford admitted that the simplicity of the demonstration rendered her unable to determine whether Amy was demonstrating that Bocanegra's finger went inside her vaginal orifice at all.[29]

We recognize that proof of penetration of the vaginal canal is not required to prove the element of penetration for purposes of aggravated sexual assault. *Vernon*, 841 S.W.2d at 409.[30] However, in this case, Nurse Crawford testified that Amy was too young developmentally to answer specific questions and that the demonstration was not accomplished through use of the anatomically correct doll but instead through a more abstract representation—the nurse's two fingers pressed together to symbolize the "cookie." Nurse Crawford testified that the four–year old "put her finger between my two fingers," which to the nurse signified that Amy was demonstrating that Bocanegra "put his finger inside of her labia." No other details are provided in this record. Applying *Vernon*, and viewed in the light most favorable to the prosecution, this evidence does provide some proof as to the element of penetration, albeit a modicum. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789; *McKay*, 474 S.W.3d at 270 (stating that "if the evidence is so weak that it creates only a suspicion that a fact exists, then it is no more than a scintilla").

The State's assertion that ". . . using an anatomically correct doll, [Amy] identified [her "cookie"] as her vaginal area. [Amy] also demonstrated how Appellant had penetrated her using her hands and fingers,"

**28.** During deliberations the jury reported that there was disagreement between them on the exact nature of the demonstration. In its seventh note, the jury reported, "We disagree on the testimony of the Cooks Childrens Nurse regarding the gesture what [Amy] stated about the demonstration of the alleged penetration. Specifically her testimony of the gesture demonstrated." The judge responded by providing all of the testimony in the record related to the demonstration.

**29.** Nurse Crawford testified that "developmentally [Amy] was unable to answer [Nurse Crawford's] specific questions," and that from Amy's demonstration she could not ascertain whether Amy was saying that Bocanegra's finger went into Amy's vaginal canal or not. When questioned on that point, Nurse Crawford testified,

Well, I can't answer that because, once again, we are talking about a four-year-old. . . . [A]ll I wanted to know [was] was that on the outside of the genitalia or on the inside, and she demonstrated—she put her finger between my two fingers. . . . [S]he demonstrated to me that he put his finger inside of her labia—of her genitalia. Whether it went all the way in, I don't know.

**30.** In *Vernon*, a 13–year old testified that her step-father touched her vaginal area "outside" her vaginal area but that she was "not sure how to describe where" it hurt. 841 S.W.2d at 408–09. The examining physician found a healing wound "not actually inside the vagina," but indicating that that an object had passed "within the plane of the sex organ." *Id.* at 409. The court of criminal appeals held that contact that is "beyond mere external contact" and "more intrusive than contact with [the] outer vaginal lips" is sufficient to support a finding of penetration. *Id.* at 409–10.

however, is misleading. This characterization of the evidence suggests that Amy demonstrated penetration using an anatomically correct doll. There is no evidence that this occurred. This rendition of the facts erroneously asserts that Amy used her hands to demonstrate penetration, which as discussed above, is not supported by the record. And, taken as a whole, this particular passage suggests a level of clarity and strength of evidence that is not present in this record.

### D. Review of the State's Evidence—Paragraph 5

*She also reported that [Amy] wet the bed, but not that the child had accidents during the day, though she was asked about it. [RR IV 26–27]. Nor did she indicate that the child was using any medications. [RR IV–26; V–69].*

#### 1. Daytime Accidents.

To discredit Mandy's otherwise consistent testimony that Amy's urinary problems did not suddenly surface with the allegation of sexual assault, the State recites as a fact that Mandy "reported [to the nurse] that [Amy] wet the bed, but not that the child had accidents during the day, *though she was asked about it.* [RRIV26–27]." [Emphasis added.] The first two assertions—that Mandy reported that Amy wet the bed but did not report that she had accidents during the day—

may be fairly inferred from the evidence in the record. But drawing a conclusion as to the latter assertion—that, *after being asked about it,* Mandy failed to report daytime accidents, which would lead to an inference that Mandy's trial testimony regarding the occurrence of daytime wetting was a lie—is not supported by the evidence.

From the nurse's earlier testimony that she "[took] a history from [Mandy]" and her explanation that the word "nocturia," which appeared in a report,[31] meant "the child wets the bed at night," [32] it may be reasonably inferred that some discussion, albeit of an unknown nature, depth, or focus, occurred between the nurse and Mandy related to the child's urinary habits. But the nurse was not asked—and she did not offer—whether she had asked Mandy if Amy wet herself during the day.

The only evidence at trial on this point was the nurse's testimony as follows, "Usually when I ask about the urinary system, I'll say, has your child ever had a UTI, and does your child wet the bed, does your child wet herself during the day, any painful urination, so forth." [33] Here, the nurse's use of the phrases, "usually when I ask ... I'll say ..., so forth," leaves a gap in proof as to whether it was the nurse's regular routine or practice to ask this specific question, or whether the questions recited were simply examples of the type of questions that she might ask. Without

---

**31.** The report referred to during the testimony was not offered or admitted into evidence.

**32.** Contrary to Nurse Crawford's understanding of the term, "nocturia" does not mean "bedwetting." *See* Webster's Third New International Dictionary 1533 (2002) (defining "nocturia" as "urination at night esp. when excessive"). "Enuresis" is the proper medical term for involuntary urination by children at night. *See id.* at 759 (defining "enuresis" as "to urinate in, to wet the bed" and "an invol-

untary discharge of urine"). Nevertheless, we accept that Nurse Crawford's use of the term "nocturia" here meant that Amy wet the bed at night.

**33.** The nurse provided no guidance as to the regularity or frequency of asking these specific questions, other than to use the modifier "usually," and by use of the phrase "so forth" to indicate that the questions to which she was referring were of a same or similar type.

additional evidence demonstrating that asking about daytime wetting was a specific question that she would routinely ask under these circumstances, the jury is left to speculate whether the nurse did, in fact, ask Mandy this question on this occasion. *See Anderson v. State*, 15 S.W.3d 177, 183 (Tex. App.—Texarkana 2000, no pet.) ("In order to offer evidence of habit, the proponent must at least demonstrate a regular practice of meeting a particular kind of situation with a specific kind of conduct."); *Medina v. State*, No. 08-01-00430-CR, 2003 WL 22159043, at *6 (Tex. App.—El Paso 2003, pet. ref'd) (mem. op., not designated for publication) (same).

The nurse did not testify that she asked Mandy about the urinary system, and, if so, if she included any or all of the "usual" questions.[34] From her testimony—couched in terms of "when" she asks, she will "usually" ask—no reasonable inference can arise that on this particular occasion, she *did* ask about the urinary system and that she *did* include a question regarding daytime urinary accidents. Therefore, to find such a fact from this meager evidence would require impermissible speculation. *See Hooper*, 214 S.W.3d at 16.

Perhaps more to the point, whether Amy wet herself both at night and during the day, or whether she wet herself only at night, is a distinction without a difference. Whether urine got on Amy's skin nocturnally or diurnally, the record showed that on a recurring basis her underwear or diaper would become wet with urine at some point, often causing a diaper rash.

The contention at trial was that Amy—well beyond normal potty-training age—experienced rashes caused by wetting herself. It is neither here nor there whether the wetting occurred at night or during the day. Even assuming that Mandy failed to mention that the wetting occurred also during daylight hours, this omission provides nothing of probative value in this case.

### 2. Use of Medications.

Likewise, in an attempt to discredit the otherwise uncontroverted testimony that during this time period Amy suffered from diaper rashes and irritations requiring the application of prescription diaper rash cream, the State alleges that Mandy failed to "indicate [to the nurse] that the child was *using* any medications. [RR IV–26; V–69]" at the time of Amy's exam. [Emphasis added.] This, too, is not entirely accurate.

First, if the State uses this phrase to suggest that during the discussion regarding Mandy's urinary problems, Mandy did not tell Nurse Crawford that she used cream on Amy's rashes, there is no direct evidence to support that contention. Neither Nurse Crawford nor Mandy testified that Mandy failed to tell the nurse that she used cream on Amy's rashes. Silence on this subject cannot give rise to an inference Mandy did not inform the nurse about the use of cream on Amy's diaper rashes in the context of their discussion about Amy's "nocturia," or bed-wetting.

Second, words matter. By deliberately substituting a different word for the word that actually appears in the record, the State suggests that Mandy had an obli-

---

**34.** At most, the record reveals that Mandy did not "talk to [the nurse] about the fact that [Amy] had been wetting during the day and having accidents at school," but instead "just indicated the wetting the bed at night." The nurse was asked,

Q. ... And did mother talk to you about the fact that she had been wetting during the day and having accidents at school, by any chance?

A. She didn't, ma'am. She just indicated the wetting the bed at night.

gation to reveal the use of prescription cream when questioned about what medications Amy took. In its recitation of the facts, the State contends, "[n]or did she indicate that the child was *using* any medications." [Emphasis added.] Had Mandy actually denied that the child was *using* any medication, perhaps the analysis would be different. But the phrase "using any medication" does not appear in this record.

Instead, Mandy was asked about Amy's "taking" of medications:

Q. And did you not deny that she was taking any type of medications?

A. I felt like they were talking about—

Q. Okay. "Yes" or "no." I just need you to answer "yes" or "no." Did you deny that she was taking any medications?

A. Yes, because she wasn't taking medication, medicine.

Mandy did admit that when the nurse asked her questions about the medications Amy was "taking," she "denied" that Amy was taking any medications. But the gist of Mandy's brief testimony on this point was that she did not equate the use of cream on a diaper rash as "taking" medication.[35] Her understanding of the English language in this context is not inconsistent with Nurse Crawford's testimony, where the concept of taking medication is treated separately from the concept of applying a cream or salve:

Q. [H]ave you seen young children with urinary tract infections?

A. Yes, ma'am, many times.

. . . .

Q. If a—what is the treatment for that?

A. For a urinary tract infection they would be on medication, depending on what the doctor puts them on. A lot of— a quite common medication is Bactrim, but each doctor has its own—they have their own choice.

Q. Have you ever seen where it's been treated with cream or salve?

A. Not for urinary tract infections, I have not.

Q. What have you seen it [sic]?

A. For a rash I have seen creams, yes, ma'am.

Without engaging in speculation, and in the most favorable light, the evidence in this record shows only that Mandy failed to mention the use of cream on Amy's diaper rashes when questioned about whether Amy was "taking" medication. The record does not support the State's assertion that Mandy "[did not] indicate that the child was *using* any medications." [Emphasis added.] The record is silent both as to whether she was asked that question and answered it or whether she volunteered this information at some point. Silence in the record on this point cannot give rise to a reasonable inference that

**35.** The State's deliberate substitution of the verb "use" in place of "take" when "take" is the only verb employed throughout this record on this topic might also signal the State's appreciation of the awkwardness of applying the term "taking medication" to the context of medicine that is not ingested in the conventional sense. For example, "taking cream," for most native English speakers, would invoke the preparation of coffee or other beverage, not applying cream to a diaper rash. "Using cream," however, could include rubbing cream on the body. *Compare* Webster's Third New International Dictionary 2523, 2524 (2002) (defining "use" as a verb to mean "to consume or take (as liquor or drugs) regularly") *with id.* at 2329, 2330 (defining "take" as a verb to mean "to introduce or receive into one's body (as by eating, drinking, or inhaling)").

Mandy "[did not] indicate" that Amy was *using* medications. *See generally Rodriguez*, 454 S.W.3d at 507–08 (discussing the distinction between acts and omissions and citing *Hooper* to hold that a jury may not draw a reasonable inference that an accused committed an affirmative act when there is no evidence of any such act).

### E. Review of the State's Evidence— Paragraph 6

*The nurse examiner further observed that the hymen of a four-year old girl "is very thin" and taut, so that even if penetration "did not actually go through the hymen," pressure on it "would be painful to the child." [RR IV–23–24]. [Mandy] did not report the presence of a rash on [Amy] to the nurse examiner, and the nurse examiner did not report seeing one on the child. [RR IV–20; V–35, 76].*

### 1. Pressure on the hymen would be painful to the child.

The nurse testified that applying pressure to a four-year-old's hymen would cause pain—

A. ... With the four-year-old, that hymen is very thin and it's painful to even—even if it did not actually go through the hymen, even pressure against the hymen would be painful to the child because it's very thin and it doesn't—because of the lack of estrogen.

By the same token, the nurse confirmed that applying cream to a diaper rash could be painful, too.

Q. Can [rashes] be painful?

A. That's correct.

. . . .

Q. ... if someone were to apply a cream, any pressure on [a rash], could that be painful?

A. It could be pain—it could be painful too, depending on the severe [sic] the rash is and how—how they are applying the cream.

As the court of criminal appeals explained in *Hooper*, in a room full of people with smoking guns, it is not reasonable to isolate one gun-holder and infer that she was the shooter. 214 S.W.3d at 16 (explaining that in this circumstance, without more evidence, "no rational juror should find beyond a reasonable doubt that she was the shooter"). Doing so "would require impermissible speculation." *Id.* Given the nurse's testimony regarding the sensitivity of a four-year-old's hymen and the painfulness of a severe rash, either reason—sexual assault or application of cream—would explain why Amy experienced pain at Bocanegra's touch. Applying the analysis used in *Hooper*, it is not reasonable to isolate one potential cause of the pain and infer, in the absence of additional contextual facts, that the pain was due to a sexual assault as opposed to the application of cream. Thus, the jury was not free to speculate that a sexual assault occurred simply because Amy reported that when Bocanegra touched her, "it hurt."

### 2. Presence or absence of the rash.

We have checked the record references provided by the State in its brief to support the assertion—"[Mandy] did not report the presence of a rash on [Amy] to the nurse examiner, and the nurse examiner did not report seeing one on the child"—and none of those references support it. And after a thorough examination of the record, we find not one iota of evidence whatsoever that does. The nurse was not asked—nor did she offer—whether Amy had a rash on the day of the examination.[36] As for Mandy, the entirety

---

36. The nurse testified that there were no

"findings indicative of sexual assault," such

of her testimony on this point was that she could not recall if Amy had a rash that day but would have told the nurse if she did:

Q. When you took [Amy] to Cook's, did she have a rash? Were you getting her any cream at that time?

A. I don't recall.

Q. Okay. If she had been, would you have told the nurse that?

A. Yeah.

Q. Did you think—

A. If it was current, yes, I would have told her.

In its brief, the State directed us to the following—a question posed by the prosecutor to Bocanegra on this subject—to support its assertion that this was a fact proven at trial:

Q. She didn't have any rashes. You heard the nurse testify, correct?

A. Well, the nurse wouldn't know something if we didn't.

However, two problems present themselves with regard to the State's reliance on this as evidence to support the premise that on the day she was examined, Amy had no rash, that Mandy reported no rash, and that the nurse reported no rash.

First, it is axiomatic that an attorney for a party cannot inject his or her own unsworn statements of fact into the record during trial. *See Menefee v. State*, 614 S.W.2d 167, 168 (Tex. Crim. App. 1981) (holding that prosecutor's unsworn testimony during closing argument constituted

reversible error); *see also Freeman v. State*, 340 S.W.3d 717, 728 (Tex. Crim. App. 2011) (stating that improper references during closing argument to facts that are neither in evidence nor inferable from the evidence are generally designed to arouse the passion and prejudice of the jury and, as such, are inappropriate), *cert. denied*, 565 U.S. 1161, 132 S.Ct. 1099, 181 L.Ed.2d 986 (2012); *Neuenschwander v. State*, 784 S.W.2d 418, 420 & n.1 (Tex. Crim. App. 1990) (observing that prosecutor's opening remarks were not evidence of a disputed fact). Thus, here, the prosecutor's comment that "[s]he didn't have any rashes"—embedded into the question posed—is improper unsworn evidence, and, consequently, it is no evidence at all.[37] *See Eby v. State*, 165 S.W.3d 723, 738–40 (Tex. App.—San Antonio 2005, pet. ref'd) (observing that when the State wholly failed to present any evidence, direct or circumstantial, about whether appellant knew his wife was a beneficiary under the victim's life insurance policy, the insurance motive evidence was irrelevant and should have been excluded from the jury's consideration instead of permitting its injection as fact in the prosecutor's questions).

Second, the comment embedded into the question improperly assumed facts that were not in evidence. *See Girard v. State*, 631 S.W.2d 162, 164–65 (Tex. Crim. App. [Panel Op.] 1982) (holding prosecutor's argument outside the record harmful error in a "closely contested case"). As stated above, no evidence in the record exists—

---

as lesions, abrasions, or other injuries. She did not testify whether she considered rashes to be an injury indicative of sexual assault, nor is there any evidence that the presence of a rash would fall within the ambit of "findings indicative of sexual assault."

**37.** Bocanegra's answer provides no evidence of this "fact." He neither agrees with nor concedes the truth of the prosecutor's erroneous restatement of the nurse's prior testimony. Nor would Bocanegra have been in any position to agree or disagree with such a premise, since the evidence established that he was not involved in any manner with Amy's examination and thus would have had no personal knowledge of the presence or absence of a rash on Amy that day.

from the nurse or any other witness—with regard to the presence or absence of a rash on Amy on the day of the examination, whether Mandy reported the presence of a rash, or whether the nurse noted the presence of a rash. The prosecutor's improper inclusion of a representation to the contrary does not substitute for evidence on that point.

Furthermore, even if the State had conclusively established that Amy had no rash on the day of the examination, it is difficult to conceive of any relevant, reasonable inference that could be drawn from such evidence because all parties agreed that Amy's examination occurred months after the alleged abuse would have occurred. The presence or absence of a rash on a random day months later would not prove that Amy had no problem with rashes, no more than the presence or absence of an ear infection on any given day would prove that Amy did nor did not suffer from recurrent ear infections.

Viewed in the light most favorable to the prosecution, even assuming this purported evidence had support in the record—and it does not—it amounts to nothing but suspicion and speculation.

## F. Review of the State's Evidence— Paragraph 7

*[Bocanegra] testified that during the time he lived with [Mandy] and [Amy], he took over the role as the child's father, and as a consequence performed such parental chores as changing her diapers, feeding her, bathing her, playing with her, and "comfort[ing] her." [RR V–24, 26].*

We are uncertain what significance the State suggests we attribute to the words, "comforting her"—words that the State cherry-picked to highlight through the use

of quotation marks that could have been properly used for the entire verb sequence. Even assuming this was not a deliberate attempt by the State to embed unsupported innuendo into its factual presentation, this literary device nevertheless has the potential to create a false impression of the record.

To clarify, the record shows that Bocanegra testified to what he did for Amy: "[b]athed her, changed her, feed her, play with her, bad dreams, comfort her. She wanted to stay awake, stay awake with her." In context, the phrase "comfort her" conveyed that among the several enumerated duties that Bocanegra testified he assumed as a parent, comforting her after bad dreams was one. To attribute any improper motives or activities on Bocanegra's part from his words, "comfort her," would require speculation in which we are not permitted to engage.

## G. Review of the State's Evidence— Paragraph 8

*He could not explain how what he had demonstrated would have made [Amy] "feel [his] finger so far inside her vagina it [made] her belly hurt," and conceded that what he showed the jury "does not match up to what [Amy's] outcry was." [RR V–36–37]. He also claimed he could not remember whether he had told detectives investigating the complaint that he had applied medicine to the child's vagina, though he acknowledged that it would have been important to tell them. [RR V–37–38]. He declined to review the tape of the detective's interview to refresh his memory. [RR V–37–38].*

**1. Allegation that Amy "[felt his] finger so far inside her vagina it [made] her belly hurt."**

On numerous occasions at trial and now on appeal the State argues that Amy felt Bocanegra's finger "so far inside her vagi-

na it [made] her belly hurt." The State then points as evidence of his guilt to Bocanegra's inability to explain this assertion in a way consistent with his ·claim of innocence. But this assertion of fact has no basis in the record, nor is it a reasonable inference from the evidence.

Amy's entire unabridged outcry—as stated by every testifying witness who heard it—was simply this: Amy said, "Daddy touched my 'cookie,'" and "it hurt my tummy." No witness during trial ever uttered the phrase, "so far inside her vagina it made her belly hurt," or words to that effect. The entirety of Mandy's testimony regarding the substance of Amy's outcry was:

> Q. Where did she tell you that her dad touched her?
>
> A. In her "cookie" which was her little private part.
>
> . . . .
>
> Q. What did she tell you where her daddy put his fingers?
>
> A. In her "cookie."
>
> Q. Okay. And what did she tell you how that made her feel? How did that make her feel?
>
> A. She said it hurt her tummy.
>
> . . . .
>
> Q. And [Amy] told your mom the same thing?
>
> A. Yes.

The entirety of Nurse Crawford's testimony on this point is,

> Q. So, Ms. Crawford, what statement did [Amy] make concerning being sexually abused?
>
> A. . . . She said, "Cal[u]b touched my cookie," and she described pain with that.

. . . .

> Q. And did she tell you whether or not that hurt?
>
> A. Yes. I asked her if it hurt and she described pain with that.
>
> . . . .
>
> Q. Okay. Now, you said that she said, this is exactly what she said, "Daddy touched my cookie," right?
>
> A. Verbatim she said, "My dad"—I asked her what her dad's name was, she said, "Cal[u]b touched my cookie," yes, ma'am.

As to the allegations of how far Bocanegra's finger penetrated Amy's vaginal area, Nurse Crawford clearly indicated that she could not determine from Amy's demonstration whether Bocanegra had put his finger inside her "vaginal orifice" at all, but only that he put his finger "inside her labia majora," which the nurse defined as "the outer lips." [38] There was no other evidence introduced that attributed any additional details made by this four-year-old child regarding penetration.

The statement regarding sticking fingers "so far up her vagina" is a phrase attributable only to the prosecutor, who uttered the phrase repeatedly—over defense counsel's objections that such a statement was outside the evidence and misleading—during the prosecutor's questioning of Mandy and the cross-examination of Bocanegra, as well as during final argument.

During the State's cross-examination of Bocanegra, the prosecutor asked,

> Q. So how on earth, if you're [applying cream], does [Amy] describe you sticking your fingers so far up her "cookie" it made her belly hurt?
>
> [Defense Counsel]: Objection, Your Honor. That's not in evidence and she

---

**38.** The nurse's premise was that due to the delicate nature of a four-year-old's hymen, pressure alone, without penetration, would cause pain.

never said that. That was not in evidence and she—

.... And misleading the jury, Your Honor.

The Court: I'm going to overrule that objection.

Finish your question.

Q. How does that, what you just showed us, how does that—how on earth would that make her feel your finger so far up inside her vagina it makes her belly hurt?

A. I don't know.

When questioning Mandy, the following exchange occurred,

Q. [Mandy], [Amy] said that her daddy stuck his finger so far up her "cookie" that it made her belly hurt—

[Defense Counsel]: Objection.

The Court: Let her finish the question.

Q. Who is lying about that statement, [Amy]—

[Defense Counsel]: Objection, Your Honor—

Q. —or the defendant?

[Defense Counsel]: That statement was never made in here. Nobody testified to that in this courtroom. It's not in evidence.

The Court: What's not in evidence?

[Defense Counsel]: That—that she—that [Amy] said that he stuck his finger so far up her "cookie"—her private that it hurt. The statement that we've been talking about was she said my daddy touched my "cookie." She never said somebody stuck their finger so far up my "cookie." And [the

prosecutor]'s been twisting it around, Your Honor.

The Witness: Yes, she has.

The Court: Ma'am, that was not a question to you.

You'll have an opportunity to redirect. Ask the question.

No matter how many times this phrase was uttered by the prosecutor—over the objection of defense counsel—there was no direct evidence in this record to support it, nor was it a reasonable inference from the meager evidence that existed. Particularly troubling about the repeated use of this invented phrase throughout trial and argument is the potential impact this mischaracterization may have had on the jury during its deliberations. The second of ten notes sent from the jury to the judge during guilt-innocence deliberations contained the request that the trial court provide them with Amy's "exact outcry statement." In response, the trial court provided no substantive answer.[39]

Even on appeal, the State persists in employing this phrase, going so far as to identify it as a "fact," rather than mere hyperbole. If Amy ever stated that she felt his finger "so far inside her vagina it made her belly hurt," that evidence is wholly absent from this record and, at best, the State's repeated use of the phrase throughout the course of these proceedings is unfounded.

**2. Bocanegra did not "concede" that his testimony did not "match up to what [Amy's] outcry was."**

In its statement that Appellant "conceded that what he showed the jury 'does

---

**39.** The jury asked, "What is the exact outcry statement [Amy] made?" The judge responded,

In view of your request for testimony, I instruct you that the law provides as follows: "If the jury disagrees as to the state-

ment of any witness, they may, upon applying to the Court, have read to them from the court reporter's notes that part of such witness' testimony or the particular point in dispute, and no other."

not match up to what [Amy's] outcry was,'" the State heaps not just speculation upon speculation, but misrepresentation upon misrepresentation. Bocanegra did not concede, as the State alleges in its factual recitation, that his testimony did not match up to Amy's outcry. What Bocanegra acknowledged was that his testimony did not match up with the State's exaggerated version of the outcry statement. Bocanegra—who did not hear Amy's outcry—was told by the prosecutor that Amy said he stuck his finger so far up her vagina that it made her belly hurt. After being told that, he was then asked to acknowledge that this outcry did not "match up" to his testimony that he had merely applied cream to her diaper rash. Based upon the State's amplified version of the outcry, rather than the outcry itself, Bocanegra conceded that the two versions were in conflict:

Q. How does that, what you just showed us, how does that—how on earth would that make her feel your finger so far up inside her vagina it makes her belly hurt?

A. I don't know.

Q. Because those—you would agree with me that what you just showed us and what [Mandy] testified to what [Amy] said[40] does not match up?

A. I put cream on her. That's all—that's—

Q. Okay. So is that a "yes" or a "no"?

A. It's a—to what?

Q. My question. Is the answer "yes" or "no"?

A. What was the question?

Q. What you just showed us, does that match up to what [Amy]'s outcry was?

A. I guess not.

### 3. Bocanegra's lack of memory as to his prior statement to investigators.

To support its contention that Bocanegra's testimony regarding applying cream to Amy's vaginal area at times when Amy suffered from vaginal-area rashes was false, the State points to the fact that Bocanegra "could not remember whether he had told detectives investigating the complaint that he had applied medicine to the child's vagina, though he acknowledged that it would have been important to tell them." [41] Without more, this is no evidence of fabrication. Bocanegra's testimony that he could not recall whether he had mentioned the cream during the interview could no more support a finding that he did tell the police than a finding that he

40. The prosecutor not only attributed this misstatement to Amy but also attributed the source of the statement to Mandy by embedding into this question a premise that Mandy testified that Amy said this. There is no evidence to support the underlying premise, as discussed above. And there is actually evidence to contrary. As recited above, at one point Mandy—albeit improperly, though still under oath and on the stand as a witness—chimed in, "Yes, she has," when defense counsel argued to the trial court that the prosecutor had been "twisting" this particular statement around.

41. During closing argument at trial, the State did not confine itself to impugning Bocanegra's lack of memory. In a misrepresentation

to the jury of the evidence, the prosecutor not only affirmatively represented that, in fact, Bocanegra never mentioned it to the detective but also suggested that the testimony supporting the prosecutor's misrepresentation came from Bocanegra himself, stating,

Let's talk about this—this fabrication of the medication. *Who else never mentioned that two and a half years ago?* That man who's on trial today. *He testified that he voluntarily met with that detective and he never mentioned to the detective,* "Well, yeah, I mean, sometimes I have to touch down there on [Amy] but it's to apply cream." *He never once said that.* And don't you think that would be a really important thing to maybe tell a detective who's inves-

did not. Without more—and there is no additional evidence in the record on this point—the drawing of either conclusion would be merely speculative.

**4. Allegation that Bocanegra declined to review the tape of the detective's interview to refresh his memory.**

Zero plus zero equals zero—true in mathematics as well as in law. If Bocanegra declined an invitation to refresh his memory for the purpose of confirming or denying the State's contention at trial, such an act would add no additional weight to the current state of the evidence on that point, which was none. But it is questionable whether the record can even be fairly read to support the State's assertion that Bocanegra "declined to review the tape of the detective's interview to refresh his memory."

After Bocanegra testified that he did not remember what he told the detective and that the interview was "on tape," the prosecutor asked,

Q. Do you want to take a break so you can watch your interview to refresh your memory?

A. No. But, I mean ...

[Prosecutor]: Judge, may I approach the witness?

The prosecutor did not permit Bocanegra to finish his answer before she interrupted him, asked the court for permission to approach the witness, and posed a new, unrelated question. Thus, the meaning of Bocanegra's answer is difficult to ascertain.

Because the question was multifaceted, Bocanegra's "no" answer could have been responsive to the literal question posed—did he want to *take a break*—rather than focused on the stated purpose of the break, refreshing his memory. But even assuming he responded to the latter part of the question, without the benefit of the remainder of his answer, Bocanegra did not fully decline the offer, as the State alleges. Certainly, the phrase, "[b]ut, I mean," following the word "no," signifies equivocation as to his initial response. Given that the word "but" generally signals that a speaker is changing directions or departing from his previous statement, Bocanegra's use of that word indicated that he intended to change, or at least qualify, his initial answer. *See* Webster's Third New International Dictionary 303 (2002) (defining "but" to include "except for the fact—used to introduce a dependent clause," "unless," "on the contrary"). Considering all of the words that Bocanegra used, the

tigating you for aggravated sexual assault of a child? *He never said anything, not once.* And so *the first time everybody here is hearing about this cream* on poor [Amy] *is today* when this man's on trial. Where does the motivation to lie come? That's for you-all to decide but do not check that common sense at the door. [Emphasis added.]

The record is devoid of any evidence that would support this representation: Bocanegra's statement to the detective was not offered or received into evidence, the investigating officer did not testify at trial, and Bocanegra testified that he did not remember if he said it or not.

On appeal, the State retreats from these misleading arguments. Instead, the State has

summed it up correctly—Bocanegra testified that he could not recall:

Q. And you never mentioned one word about putting medicine on her vagina, did you?

A. Exact words, I don't know.

Q. Do you recall saying that?

A. I don't remember. It happened.

Q. Do you think that would have been important when he's asking you if you sexually abused the child?

A. Yeah.

Q. So you're just now saying that today that you never told the detective that; isn't that true?

A. I—I don't remember what I told the detective. It's on tape.

 

context in which they were spoken, and the fact that it was the prosecutor who interrupted him and deprived him of the opportunity to finish his answer at a point when he began to equivocate, it hardly seems a fair reading of the record, even in a light most favorable to the verdict, to declare that Bocanegra definitively declined to review the tape.

Nevertheless, even if Bocanegra's "No. But, I mean," answer could be fairly viewed as Bocanegra's "declin[ing] to review the tape of the detective's interview to refresh his memory," the State cites no authority—and we find none—suggesting that Bocanegra had any duty to do so or that failure to do so would create any presumption or negative inference under the law. Any conclusion to be drawn from Bocanegra's "declining" to review a tape to refresh his memory still amounts to nothing more than speculation.

## H. Review of the State's Evidence— Paragraph 10

*[Mandy] had repeatedly missed appointments with prosecutors and a forensic interviewer so they could talk to the child. [RR III–250–51, 265–66, 272; IV–35–37]. She acknowledged that the prosecution had to subpoena her to appear at trial. [RR III–251]. [Mandy] declared that she did not believe her daughter and she did not think that Appellant was guilty. [RR 111–262, 268]. She added on direct examination during the defense case-in-chief that [Bocanegra] paid child support for their son "right out of his paycheck." [RR III–276].*

### 1. Allegation that Mandy repeatedly missed appointments with prosecutors

**and a forensic interviewer so they could talk to the child.**

There is no evidence in this record that Mandy ever missed an appointment with a prosecutor. As discussed above, the record establishes that she missed two appointments [42] with the forensic ·interviewer— interviews that were requested by Mandy, not the State, after Mandy expressed concern following a conversation she had with Amy, the substance of which is not in the record.

### 2. The "need" to subpoena Mandy.

The record contains only one question and one answer that in any way related to the subpoena that the State issued to Mandy to compel her appearance and Amy's appearance at trial:

Q. And, in fact, I actually had to subpoena you today to bring your daughter with you; did I not?

A. Correct.

The use of a subpoena is the standard and acceptable way for either party to ensure that witnesses attend trial. *See* Tex. Code Crim. Proc. Ann. arts. 24.03 (West 2009) (stating that the defendant or the State may apply for a subpoena for each desired witness and once that witness has been served "at the instance of either party in a particular case, such execution of process shall inure to the benefit of the opposite party in such case in the event such opposite party desires to use such witness on the trial of the case"), 24.12 (stating that when a witness who resides in the county of the prosecution has been served with a subpoena to appear and

---

**42.** Dula testified that on "[m]ultiple occasions" she tried to "set up" appointments, but she testified as to only one appointment that

Mandy did not keep. Mandy testified that there were two appointments.

testify in any criminal action or proceeding and fails to appear, "the State or the defendant shall be entitled to have an attachment issued forthwith for such witness"); *see also id.* art. 24.011(a) (West Supp. 2016) ("If a witness is younger than 18 years, the court may issue a subpoena directing a person having custody, care, or control of the child to produce the child in court.").

There are any number of legitimate reasons why a witness would require a subpoena before appearing at trial or bringing a child to court to provide testimony,[43] and the record indicates that the State also issued subpoenas to compel the appearance of Nurse Crawford and the forensic investigator. While the State had an opportunity to develop testimony regarding the reason the subpoena was issued to Mandy, it did not do so. When a witness complies with a subpoena and attends trial as commanded, in the absence of some additional evidence, it can no more be logically inferred that the witness required a subpoena for a legitimate reason than it can be inferred that she required a subpoena for some illegitimate reason.

**3. Allegation that Mandy declared that she did not believe her daughter and that she did not think that Bocanegra was guilty.**

In support of this statement, the State refers us to pages 262 and 268 of the third volume of the reporter's record in this case. The only testimony that appears on either of these pages that relates to this assertion by the State is:

Q. At some point, I don't think it is very long ago, maybe a couple months

ago, you spoke with the district attorney about this case, correct?

A. Two months ago, yes.

Q. Okay. And basically, were you telling her—What were you telling her about the case?

A. That I felt different then [sic] what I felt like when I first filed it.

Q. And why?

A. Because I don't think he did it.

Once again, word choice matters, and declarations and inferences are not the same thing. Based on the record references provided by the State in its brief, Mandy's testimony here, without more, might give rise to an inference that she did not believe her daughter. It does not, however, rise to the level of a declaration, as the State contends, that she did not believe her daughter.

More notable, however, is the record reference that the State *omits* from its brief. When questioned directly on this very point, Mandy testified:

Q. And you don't believe your daughter?

A. *I do believe* my daughter. [Emphasis added.]

So, despite the State's contention that the facts—in the light most favorable to the verdict—prove that Mandy "*declared* that she did not believe her daughter," Mandy declared no such thing. [Emphasis added.] Of course, the State is not required to recite—nor are we to base our review upon—evidence that is favorable to Bocanegra. However, if the State is to be candid with the court about what Mandy did declare, the State must disclose that what Mandy "declared" was that she *did* believe her daughter.

43. For example, a witness might need a subpoena as documentation to an employer to receive time off from work to attend trial.

Or to maintain candor with the court, the State could have argued, as discussed above, that because Mandy testified that she believed that Bocanegra was not guilty, she must, therefore, not believe her daughter. And, while at first blush it appears to be a reasonable inference that by believing Bocanegra not guilty, Mandy must, therefore, not believe her daughter, under the circumstances of this case, this inference is not at all reasonable.

Given the nature of the defense in this case, believing the truth of the statement that Bocanegra "touched her cookie and it hurt," is not inconsistent with a belief that Bocanegra was not guilty of sexual assault. As the court of criminal appeals explained in *Hooper* by using the example of the lady with the smoking gun, an inference is not reasonable when there are other competing reasonable inferences that could also be drawn from the facts presented.[44] *Hooper*, 214 S.W.3d at 16. Because here, Mandy could have believed Amy and still believed that the touch and the pain reported by her were associated with the application of cream to Amy's diaper rash, and not as a result of sexual assault, the inference that Mandy thought her daughter was lying—especially in the face of direct testimonial evidence to the contrary—is unreasonable.

Throughout trial, the State criticized Mandy because she admitted that she did not think Bocanegra was guilty. The State attempted to use this as evidence of bias during trial, in its final argument, and now on appeal. During testimony, the State accused Mandy of basing her opinion on a consultation with a tarot card reader. During argument, the State accused her of "not standing up for [Amy]," and the prosecutor urged the jurors to rectify that situation by "stand[ing] up for Amy" and "protecting her" by "convicting that man of what he did." The prosecutor argued,

> . . . Don't you think I would love to have a mother up here who cared about her child? I mean, don't you think this case would be so much easier if she wasn't such a horrible, horrible mother? Because that's exactly what she is, and she is a liar. . . . [Amy] told her mommy that her daddy sexually assaulted her, and what does mommy do? Leaves her child with him every single day.[45] Are you kidding me?
>
> . . . .
>
> How horrible is that for this child? Because you heard about everybody in jury selection, people that feel the effects of sexual abuse and how long it affects them for the rest of their lives.[46] What happens when your mom doesn't protect you? Because ladies and gentle-

---

44. As the court explained,

> If [the woman holding the smoking gun] is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. *But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns.* To do so would require impermissible speculation.

*Hooper*, 214 S.W.3d at 16 (emphasis added).

45. This statement is wholly unsupported in the record.

46. This argument was outside the record. First, the statements made by jurors during voir dire were not evidence in this trial. Second, there is no evidence in this record that Amy, who testified that she did not remember the incident, would "feel the effects of sexual abuse . . . for the rest of [her life]."

men. I can tell you that's a sad reality that we sometimes have with these cases, is these mothers who would rather stay with their man than take care of and protect their child.... And for her, she doesn't even deserve to call her her daughter. It's offensive and it's disgusting.

. . . .

And then you heard from [Mandy], who was a complete liar. Everything that comes out of that woman's mouth is a complete lie.

. . . .

... Because you know what? At the end of the day she thinks she's going to manipulate people into believing that this did not actually happen to this child. And she thought if she ran long enough and dodged long enough and she lied, that he would get away with this so she could stay with him.... She came up here with some man she apparently started dating a week ago, sends her kids home with him and waits outside the court for him every single day while her daughter is standing there crying and she completely ignores her, because she doesn't care about her kids.[47] All

she cares about is having a man in her life, and it doesn't matter what that man does.

. . . .

And then [Mandy] comes back in here and she just lied all over again, because she wouldn't even give us the same dates of when the last time he saw [Amy].

. . . .

... I mean, the people that are most—we all have a responsibility to protect children, every single one of us, but more than anything, your parents, your mom and dad. They are the ones that are supposed to protect you from all the evil, all the bad things in this world. And this little girl's innocence was taken from her at such a young age and that is something that we are never going to get back. And she was brave enough to say something[48] because she wanted it to stop.[49] Because just like I asked [Mandy] today, [Mandy] told the CARE Team nurse that she asked daddy to stop it and he wouldn't.[50]

.... you know, you know all too well that [Mandy] is never going to protect her children. Never.

47. There is no evidence in the record to support the statement that Mandy sent her kids home with a boyfriend, that she waited outside the court for Bocanegra while her daughter stood crying, or that Mandy ignored Amy in any manner.

48. There is no evidence in the record of any "bravery" on Amy's part nor any evidence that "bravery" could be inferred from the circumstances surrounding her outcry.

49. There is no evidence of Amy's motivations, nor can any be inferred from any evidence in this record.

50. There is no evidence in the record that this occurred. At trial the prosecutor asked, "[Y]ou actually told the nurse that [Amy] asked him to stop and he wouldn't; isn't that what you told her?" Mandy answered, "I don't remember that." The nurse was not asked, nor did she offer any testimony on this point. The record reflects that this caused concern to the jury during deliberations. Included among the ten notes that the jury sent to the judge during the guilt-innocence phase was the question, "We disagree whether [Amy] or [Mandy] or prosecution said '[Bocanegra]' wouldn't stop. Who said it? And stop what?" In response, the judge provided the prosecutor's question and Mandy's response.

The State branded Mandy as a liar and, consequently, a neglectful and dangerous mother because she believed that Bocanegra was not guilty. Yet, at every turn the State resisted Mandy's attempts to explain how or why she came to believe this.[51] Nevertheless, at best—in the light most favorable to the State[52]—the State effectively impeached the veracity of Mandy's testimony by showing bias.

Bias is a form of impeachment evidence whose only aim is to attack the credibility of a witness but otherwise has no probative value. *Key v. State*, 492 S.W.2d 514, 516 (Tex. Crim. App. 1973). It is not substantive evidence sufficient to prove a material fact in a case.[53] *Id.*

**4. Assertion that Mandy added on direct examination during the defense case-in-chief that Bocanegra paid child support for their son "right out of his paycheck."**

Yet again, the State misstates the record. On this point, the record shows:

Q. He is now paying child support for [their son]; is that right?

A. Yes.

Q. I think he is paying that—It comes right out of his check?

A. Yes.

Mandy did not "add" this testimony. These words did not come from Mandy's lips at all. When asked if the child support for their son "comes right out of his check," Mandy answered, "Yes."

Disregarding the State's misrepresentation and considering the testimony in the light most favorable to the prosecution, Mandy's confirmation that Bocanegra's support payments were taken by direct withdrawal from his paycheck cannot support a finding of guilt for sexual assault. At most, this evidence proves bias, which, as discussed above, has no probative value other than to attack the credibility of the witness. *Id.* It is not substantive evidence sufficient to prove a material fact in a case. *Id.*

**51.** We recognize that the State had no duty to develop this evidence at trial, but to villainize a witness for expressing a doubt as to the guilt of an accused is antithetical to the constitutional protections in our system of justice. It clearly communicates to the jury that to indulge in a presumption of innocence—the very standard that the jury must apply to perform their function without corruption of process—is somehow wrong and shameful.

**52.** Although Mandy's testimony that, were it not for her concerns that an innocent man might be going to jail, Bocanegra "could live in prison for all I care," tends to weigh against the allegation of bias, we do not con-

sider this evidence for that purpose because to do so would be inconsistent with the standard that we view the evidence in the light most favorable to the prosecution.

**53.** Even if it were considered substantive evidence, *Mandy's subjective belief that Bocanegra was not guilty* would not tend to prove or disprove any element of the offense of sexual assault. *See* Tex. R. Evid. 401 (stating that evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence).

## I. Review of the State's Evidence—Paragraph 11

*More importantly, both [Mandy] and [Bocanegra] confessed that, in violation of [Bocanegra's] bond condition, [Bocanegra] had seen [Amy] on a number of occasions, including Christmas, when he had given her a dollhouse; a trip to Six Flags over the summer; a visit to [Mandy's] old school; a fishing trip; "parties"; dinner at a Chili's restaurant; and "whatever she wanted to do." [RR III–237, 248–50, 271–72; V–27–23, 30–31, 41–42; State's Ex. 1]. [Bocanegra] admitted that he had visited [Amy] only two weeks before trial. [RR V–39–40]. [Mandy] further testified that the last time she had received a note from school informing her that [Amy] had wet herself had been two weeks before trial—about the same time [Amy] saw [Bocanegra]. [RR V–62, 64–65].*

In its brief, the State offers these facts but fails to inform us what these facts—viewed in the light most favorable to the prosecution—would prove, other than unrelated bad acts and bias. As explained above, evidence of bias has no probative value regarding material facts in the case, but merely assails the credibility of a witness.[54] *Id.*

As for the testimony regarding the note from school about Amy wetting herself, which the State points out occurred two weeks prior to trial near the time Amy saw Bocanegra, once again, the State's recurring insinuation—during trial and in its final argument before the jury began its deliberations—that there is a correlation or causal connection between a child wetting herself and the occurrence of child sexual abuse is wholly unsupported in the evidence.

## VIII. Analysis

Our review of the evidence is a lengthy one, and it is tempting to apply the adage that "where there's smoke, there's fire." But that is not the standard.

We have also devoted much of our discussion to an examination of the facts as recited in the State's brief, detailing each piece of evidence that the State contends supports a finding of guilt and critically examining certain facts as alleged by the State to determine if it they are supported by the record or can be reasonably inferred from facts that find support in the record. And we have identified that some of the facts and inferences as alleged by the State fall short. That, too, is not the standard.

We have thoroughly examined all of the facts so that we may discharge our duty to adhere to the *Jackson* standard and consider the combined and cumulative force of all of the evidence in this case. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. The facts and evidence in this case highlight the differences between evidence, reasonable inference, and insinuation. Although insinuation can be a powerful persuasive tool, the law requires evidence of guilt to the degree of beyond a reasonable doubt such that it overcomes the presumption of innocence. While we defer to the jury in deciding questions of fact, a finding of guilt cannot be affirmed if the facts before the jury are insufficient to meet a reasonable doubt standard.

Having considered all of the evidence and viewing that evidence in the light most favorable to the verdict, we return to the question of whether Amy's statement—

---

54. We do note, however, that there is no evidence to support the State's contention that Bocanegra participated in any way in any "visit to Mandy's old school."

that her daddy touched her "cookie" and that it hurt her "tummy"—along with her demonstration of that act using Nurse Crawford's two fingers to symbolize the "female sexual organ," as related by Nurse Crawford—and Nurse Crawford's testimony confirming that pressure on the hymen would cause pain, was sufficient evidence to support Bocanegra's conviction for aggravated sexual assault and the jury's rejection of his medical-care defense.[55]

## A. Is Amy's outcry alone sufficient to support the conviction?

We are mindful of the legal principle that in cases involving sexual abuse of a child, a conviction may be based upon a child's outcry alone. But this does not mean that every outcry, standing alone, will suffice to support a conviction. And, in our review of the cases that apply this principle, we find none where an outcry as meager as this, standing alone, was found to be sufficient to support a guilty verdict beyond a reasonable doubt.

The general legal principle appears to have its genesis in a series of cases that date back more than half a century, but we begin our review of these cases with *Garcia v. State*, a case involving a seventeen-year-old child who reported having been abducted from a school parking lot, driven to a nearby park, and sexually assaulted at gunpoint. 563 S.W.2d 925, 927 (Tex. Crim. App. 1978). On appeal, Garcia challenged the sufficiency of the evidence to support his conviction, pointing out that there were no witnesses to the abduction, that the victim's body showed no physical evidence of any trauma, that her clothing was not damaged, that the medical examination that occurred shortly after the alleged crime revealed no sperm or evidence of "recurrent intercourse," and that on two occasions the girl was unable to identify Garcia as her assailant and only did so after a third view, following some prodding by the detective. *Id.* at 927–28.

On these facts, the court of criminal appeals, citing three of its prior cases,[56]

**55.** As explained above, many of the other "facts" the State urges us to consider—for example, that Mandy failed to tell the nurse that Amy was using prescription cream on Amy's rashes or that Amy wet herself during the day, that Amy described feeling Bocanegra's finger "so far inside her vagina it made her belly hurt," Bocanegra's concession that his testimony did not match up with Amy's outcry as translated by the State, Mandy's repeated missed appointments with the prosecutor, Mandy's declaration that she did not believe her daughter and Mandy's adding to her testimony that Bocanegra paid child support "right out of his paycheck"—have no support in the record, and, thus, we cannot consider them. Likewise, many of the inferences that the State encourages us to draw from the evidence—for example, that urinary, sleep, or other problems are linked to sexual assault, that Mandy had been concerned about these "problems" and Amy's outcry explained them to her, that the nurse noted no rash on Amy during the exam, and that Boca-

negra's violation of the terms of his bond somehow evidences guilt of the underlying offense—are not reasonable inferences but rather impermissible or factually unsupported speculation and, thus, cannot be considered.

**56.** The court cited three rape cases: *Watson v. State*, 548 S.W.2d 676, 679 (Tex. Crim. App. 1977) (holding that complainant's testimony, which included terms such as "intercourse," "rape," and "sexual intercourse," was "sufficient to support a finding by the jury that the element of penetration did occur"), *Harris v. State*, 473 S.W.2d 37, 38 (Tex. Crim. App. 1971) (holding that complainant's testimony "that appellant had sexual intercourse with her is sufficient to establish penetration"), and *Faulkner v. State*, 390 S.W.2d 754, 755–56 (Tex. Crim. App. 1965) (holding in statutory rape case that complainant's testimony that appellant "put his 'peter' into her private parts" and her description of the act by use of the word, "f\* \*k," was sufficient to constitute proof of penetration).

held, "The prosecutrix testified that appellant's sexual organ penetrated her sexual organ. Her testimony, standing alone, is sufficient evidence of penetration." *Id.* at 928. But in so stating, the court did not go so far as to hold that an outcry statement alone would constitute sufficient evidence in all circumstances.

Nevertheless, nine years later, the Corpus Christi court restated *Garcia* in *Villalon v. State* as an unconditional proposition that "[t]he testimony of a victim is sufficient evidence of penetration." 739 S.W.2d at 452. Even though in reversing *Villalon*, the court of criminal appeals did not address whether the Corpus Christi Court's characterization of *Garcia* was correct or not, the court, sitting en banc, did provide us with valuable guidance in viewing outcry statements in the context of sufficiency analyses. 791 S.W.2d at 132.

In its opinion, the court of criminal appeals pointed to two primary reasons why the court of appeals erred by holding that the outcry statement was insufficient in that case. First, the lower court's premise and characterization of the outcry statement as contradictory to the victim's testimony at trial was incorrect. *Id.* at 135, 136–37 (agreeing with the State that the Court of Appeals erred when it characterized the victim's trial testimony as contradictory in order to justify its exclusion of

the outcry from its sufficiency analysis). Second, even if the victim's testimony had contradicted the outcry statement, in conducting a sufficiency analysis, the court reminded us that we cannot disregard conflicting evidence as long as it is admissible under the rules, and because the outcry in *Villalon* was admissible as substantive evidence for all purposes, the lower court erred by disregarding it. *Id.* at 132–33, 135.

Through its opinion in *Villalon*, the court of criminal appeals instructs us that in conducting a sufficiency review in these cases, a child's outcry statement should be given its full probative value and not be disregarded, even if conflicting evidence is elicited from the victim herself. But the court did not base its opinion upon the principle that an outcry statement alone can support a finding of guilt; it made no such statement in the case. Instead, consistent with *Jackson*, the court of criminal appeals based its holding on a review of all of the evidence, including both the outcry statement and "the non-outcry evidence" in holding that the evidence was sufficient to prove the element of penetration on the facts of that case. *Id.* at 134.

Several of our sister courts have reiterated the principle that the statement of the victim alone is sufficient to support a guilty verdict.[57] In so stating, most courts

---

57. In 2006, in *Ozuna v. State*, the Corpus Christi court relied on the principle that an outcry statement alone can constitute sufficient evidence to support a guilty verdict. 199 S.W.3d 601, 606 (Tex. App.—Corpus Christi 2006, no pet.). *Ozuna*, however, involved facts far beyond an outcry alone: a grandmother who observed that her grandson was acting "different" and questioned him about his behavior, the evidence of physical pain that the six-year old experienced when he first revealed that while he was lying in bed watching cartoons on television, his mother's boyfriend had put his finger "in [the child's] butt," that the child was sad and crying when

he made his outcry, and the medical findings confirming that an anal sexual assault had likely occurred. *Id.* at 606–08. As to the challenge that the boy's use of short, choppy sentences and hand signals was not sufficient to support a finding of guilt beyond a reasonable doubt, the *Ozuna* court stated that "the testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault." *Id.* at 606. The court nevertheless demonstrated the depth of its analysis in its sufficiency review, pointing out all of the additional evidence in the record apart from the outcry alone to support the guilty finding. *Id.* at 606–10. Here, in con-

cite not *Garcia* alone, but also article 38.07 of the code of criminal procedure. Article 38.07(a) provides that "[a] conviction ... is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred."[58] Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2016). Article 38.07 addresses only the need for corroborating evidence, clarifying a victim's testimony need not be corroborated by other evidence to support a conviction. *See id.*

Our court has struggled with conducting sufficiency reviews in circumstances involving meager outcry statements.[59] In

trast, our record does not contain the descriptive and sensory evidence present in *Ozuna*, nor any of the other evidence that the court relied upon in finding sufficient evidence to support Ozuna's conviction.

Two years later, once again citing code of criminal procedure article 38.07, the Corpus Christi court reiterated the same principle that "[t]he testimony of a child sexual abuse victim alone is sufficient to support a conviction for ... aggravated sexual assault." *Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi 2008, no pet.). In *Soto*, the child's outcry included statements that Soto had touched her butt with his penis, forced her to rub his penis, and put his penis in her mouth. *Id.* at 330–31. Amy's outcry here does not compare with the outcry in *Soto*.

In *Halbrook v. State*, citing *Ozuna*, code of criminal procedure article 38.07, and *Garcia*, the Texarkana court also stated that "[t]he testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault," in finding sufficient evidence to support the guilty verdict. 322 S.W.3d 716, 720 (Tex. App.—Texarkana 2010, no pet.). *Halbrook* involved a child's outcry that her stepfather "made me suck on his winkie" "lots of times" and later testimony at trial that he touched the inside of her mouth with the "front part" used for "[g]oing to the restroom" a "lot of times." *Id.* As with *Garcia*, *Ozuna*, and *Soto*, despite this statement of principle, the court in *Halbrook* did not base its factual sufficiency review on the outcry statement alone. *See id.* And, also as with *Garcia*, *Ozuna*, and *Soto*, the outcry statement in *Halbrook* was more explicit than the one at issue here.

The same is true with the case of *Cantu*, where the Amarillo court used the phrase, "[t]he testimony of a child sexual abuse victim alone is sufficient to support a conviction," in finding sufficient evidence to support a conviction for indecency with a child. 366 S.W.3d at 775–76 (citing *Soto*, 267 S.W.3d at 332).

*Cantu* involved an eight-year old child who related that she and Cantu—while they had been alone in a car together—stopped on a dirt road and "did it," that the two "took off [their] pants and [she] sat on him." *Id.* at 774. At trial, she elaborated that Cantu kissed her, that they put their "private part[s]" together, and that he threw the condom that he was wearing at the time out the window of the vehicle. *Id.* Certainly, based upon the child's detailed outcry alone regarding the incident, including its geographical location—and then when combined with the child's testimony at trial—the court in *Cantu* could find sufficient evidence to support a conviction for indecency with a child. *Id.* at 774–75. Here, we have no such detail in the initial outcry, nor any probative evidence from the child at trial.

58. Section (b) waives the requirement that the victim inform another person of the alleged offense for certain persons, including children and the elderly. Tex. Code Crim. Proc. Ann. art. 38.07(b) (West Supp. 2016).

59. For example, in *Morrison v. State*, we reviewed the sufficiency of the evidence to support an aggravated-sexual-assault-of-a-child conviction involving a four-year old boy's statement to the sexual assault nurse examiner that "[Appellant], I suck him penis. Him make me to." No. 02-05-00443-CR, 2007 WL 614143, at *1, *4 (Tex. App.—Fort Worth Mar. 1, 2007, pet ref'd) (mem. op., not designated for publication), *cert. denied*, 552 U.S. 1126, 128 S.Ct. 942, 169 L.Ed.2d 777 (2008). But in holding that there was sufficient evidence to support the conviction, we considered not only this statement—which is more detailed than the outcry here and evidences an assault to which a medical-care defense could not under any circumstances apply—but also other evidence, which included the child's demonstration of the assault to a child forensic examiner, which she described as his

many of those cases, we have also been heard to say, "a complainant's testimony alone is sufficient to support a conviction." *Bazanes*, 310 S.W.3d at 40; *see, e.g., Garner v. State*, No. 02-15-00171-CR, 2016 WL 4247970, at *3 (Tex. App.—Fort Worth Aug. 11, 2016, pet. ref'd) (mem. op., not designated for publication); *Slagle v. State*, No. 02-14-00335-CR, 2015 WL 4692422, at *4 (Tex. App.—Fort Worth Aug. 6, 2015, pet. ref'd) (mem. op., not designated for publication); *Escamilla v. State*, No. 02-13-00317-CR, 2014 WL 4463121, at *2 (Tex. App.—Fort Worth Sept. 11, 2014, no pet.) (mem. op., not designated for publication).

But as with our sister courts, we cite code of criminal procedure article 38.07 to support that statement. No case from our court—or any other court that we have found in our review—has ever suggested that just any outcry will do. *See Escamilla*, 2014 WL 4463121, at *2 (explaining that lack of corroboration "is not fatal" and that "the absence of physical evidence or corroboration does not, *ipso facto*," render the evidence insufficient). To the contrary, whether dealing with an outcry plus corroborating evidence or an outcry alone, we apply the *Jackson* standard in conducting our review, and if we must rely upon the outcry alone, the combined and cumulative force of the outcry itself must be sufficient to establish guilt beyond a reasonable doubt. *See* 443 U.S. at 319, 99 S.Ct. at 2789.

Physical evidence in this case is nonexistent. The alleged victim remembered nothing at trial. The outcry, as testified to at trial, was bare-bones and as consistent with a legitimate parental caretaking function as a potential sexual assault. There

placing his mouth on the penis of an anatomically correct doll to show her what happened.

was no other evidence in the record that tended to prove that Bocanegra committed a crime.

To hold that this particular outcry alone—without any other evidence to support the allegation that a crime was committed—puts every parent, grandparent, sibling, daycare worker, or other caregiver of any kind at risk of being imprisoned for performing a basic and necessary function in the care of a child. The liberty of every person who changes a dirty diaper—thoroughly, properly, and hygienically—when doing so necessarily requires the touching of a child's genitals and in certain circumstances, causes pain to a child by virtue of hurried, clumsy, or rough handling, or by cinching a diaper too tightly around a child's abdomen, is at peril should the child later speak of the pain or discomfort he or she experienced during the diaper change.

In this case, a young parent testified that he had never touched the child's genitals in a sexual way but did touch her genitals when changing her diaper and applying cream to her sometimes-painful diaper rash. Disregarding the State's purported circumstantial evidence that we have pointed out does not exist in the record, as well as the State's purported circumstantial evidence that is speculative and not reasonably inferred from other evidence, along with the abundant innuendo that does not rise to the level of evidence, we come back to Amy's outcry that he "touched her cookie" and it "hurt her tummy," a simplistic demonstration of penetration using fingers to symbolize the female sexual organ, and confirmation that pressure on the hymen would cause a child pain as the only probative evidence on the question of guilt. All other evidence, when viewed in the light most favorable to the

*Id.* at *1, *9.

prosecution, is either evidence of bias, which cannot substitute as substantive evidence of guilt, or otherwise irrelevant to a determination of guilt as to the offense charged.

As *Jackson* instructs us, in our sufficiency analysis the inquiry is not whether we believe the evidence at trial established guilt beyond a reasonable doubt. *See id.* at 318–19, 99 S.Ct. at 2789. Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, 99 S.Ct. at 2789. In most cases, the analysis can and does end there. But the *Jackson* analysis itself does not end there.

Reading further in *Jackson*, the Supreme Court's words that follow are particularly instructive. *Jackson* goes on to acknowledge—as "readily apparent"—that the notion that a mere modicum of evidence may satisfy a sufficiency review must be rejected. *Id.* at 320, 99 S.Ct. at 2789. To apply the standard of review in such a manner as to support a conviction upon a mere modicum of evidence would fail to "protect against misapplications of the constitutional standard of reasonable doubt." *Id.*, 99 S.Ct. at 2789. Because "[a]ny evidence that is relevant—that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence"—may satisfy a "mere modicum" threshold, such a low standard would constitute a "misapplication" of the reasonable doubt standard and violate the due process command that a conviction be supported only on proof that overcomes reasonable doubt. *Id.*, 99 S.Ct. at 2789–90. Jackson makes clear that "it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." *Id.*, 99 S.Ct. at 2789.

*Jackson* directs us that in cases involving only a modicum of evidence, we must not forget that a central part of our inquiry should be whether that proof rises to the level of proof beyond a reasonable doubt. This focus is "central to the basic question of guilt or innocence" and "not confined to those defendants who are morally blameless." *Id.* at 323, 99 S.Ct. at 2791.

This case highlights this juxtaposition that *Jackson* describes. While we give deference to the factfinder to judge the credibility of the witnesses and to weigh the evidence, regardless of the weight given to it as demonstrated by its verdict, if the record reveals no more than a mere modicum of evidence, that evidence cannot support a finding of guilt, or rejection of the medical care defense, beyond a reasonable doubt. When all of the dust has settled here, looking only at the actual facts that have support in the record and all reasonable inferences—ignoring innuendo, insinuation, and impermissible speculation—from those facts, even in the light most favorable to the prosecution, the evidence here amounts to a mere modicum. As such, it is insufficient to satisfy the constitutional standard of proof beyond a reasonable doubt. *See generally id.* at 319–20, 99 S.Ct. at 2789–90.

The dissent raises an excellent point regarding the interplay of the sufficiency of the evidence standard for the offense of aggravated sexual assault and the sufficiency standard to support the medical care defense. In it, our learned colleague argues that because the medical care defense has been held to be one of confession and avoidance, a holding "that the evidence is insufficient to support the elements of the offense of aggravated sexual assault but that the evidence is sufficient to support the medical-care defense—is

both irreconcilable and contradictory to the law." We disagree. What *is* irreconcilable, however, is the notion that in order to prevail on a medical care defense, a defendant must first admit that the contact was made with intent to arouse or gratify sexual desire—a component of the offense of aggravated sexual assault—but then prove that that same conduct consisted of medical care for the child—an element of the medical care defense. *Compare Villa*, 417 S.W.3d at 462 (holding that because the medical care defense is one of confession and avoidance, "a defendant claiming entitlement to an instruction on the medical-care defense must admit to each element of the offense, including both the act and requisite mental state"), *with Ochoa v. State*, 982 S.W.2d 904, 908 (Tex. Crim. App. 1998) (reiterating that "intent to arouse and gratify" is a part of the "proof of the elements of aggravated sexual assault," in holding that indecency with a child is a lesser-included offense of aggravated sexual assault). To suggest that an irreconcilable conflict contrary to the law

arises from holding that evidence is insufficient to support the elements of aggravated sexual assault but sufficient to support reliance upon the medical care defense would turn the medical care defense on its head.[60]

After considering the combined and cumulative force of all of the evidence in the case and viewing that evidence in the light most favorable to the verdict, we hold that the evidence was insufficient to support a finding of guilt and rejection of the medical care defense beyond a reasonable doubt. *See* Tex. Penal Code Ann. § 22.011(d); *see Villa*, 417 S.W.3d at 462 (describing appellant's testimony about putting Desitin "on the red area outside the vagina" as an admission of contact sufficient to warrant an instruction on the medical-care defense).[61] We sustain Bocanegra's fourth point.[62]

## IX. Conclusion

Having sustained Bocanegra's fourth point, we need not address his remaining

---

**60.** This irreconcilability can be illustrated by the example of a SANE who may be required to penetrate the female sexual organ of a child to conduct a medical examination. In order to rely upon the medical care defense in a subsequent allegation of aggravated sexual assault, must the SANE first admit that the examination was performed with intent to arouse or gratify? The same dilemma would be present in any situation involving the legitimate handling or care of a child that necessitated intimate contact, such as a mother's washing or bathing her child's genital area or the care at issue here.

**61.** The trial court included a medical-defense instruction in this case, which stated that if the jury found from the evidence beyond a reasonable doubt that Bocanegra intentionally or knowingly caused the penetration of Amy's sexual organ by inserting his finger into it but further found from the evidence or had a reasonable doubt regarding whether Bocanegra reasonably believed that the con-

duct consisted of medical care for the child and did not include any contact between Amy's anus or sexual organ and Bocanegra's mouth, anus, or sexual organ, then he should be found "not guilty" of the offense of aggravated sexual assault of a child.

**62.** While reversal on evidentiary sufficiency grounds is restricted to "the rare occurrence when a factfinder does not act rationally," *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009), and the appellate scales are weighted in favor of upholding a trial court's judgment of conviction, *Winfrey v. State*, 323 S.W.3d 875, 879 (Tex. Crim. App. 2010), as set out above, to reach the verdict here beyond a reasonable doubt required the jury to rely upon speculation in place of evidence or reasonable inferences from the evidence. And a conclusion reached by speculation "is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Hooper*, 214 S.W.3d at 16.

points. *See* Tex. R. App. P. 47.1. We reverse the trial court's judgment and render a judgment of acquittal.[63] *See* Tex. R. App. P. 43.2(f), 51.2(d); *Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2151, 57 L.Ed.2d 1 (1978) (requiring the remedy of appellate acquittal on grounds of evidentiary insufficiency); *Winfrey v. State*, 393 S.W.3d 763, 774 (Tex. Crim. App. 2013) (rendering a judgment of acquittal).

/s/ Bonnie Sudderth

BONNIE SUDDERTH
JUSTICE

PANEL: WALKER, MEIER, and SUDDERTH, JJ.

WALKER, J., filed a dissenting opinion.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED: February 16, 2017

---

**63.** In addition to the aggravated-sexual-assault-of-a-child charge, Bocanegra was charged with indecency with a child by "touching the breast of [Amy]," and the jury found him "not guilty" of that offense. *See, e.g.,* Tex. Penal Code Ann. § 21.11(a)(1), (c)(1) (West 2011) (stating that a person commits an offense if, with a child younger than 17 years old, he engages in sexual contact with the child with the intent to arouse or gratify the sexual desire of any person by touching the child's breast). Bocanegra was not charged with indecency by engaging in sexual contact with the intent to arouse or gratify the sexual desire of any person by touching Amy's genitals, and based on our review of the evidence above, there is insufficient evidence to support reforming his conviction to reflect that offense. *See Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014) (setting out the two questions that a court of appeals must answer in determining whether to reform the judgment to reflect a conviction for a lesser-included offense as whether the jury could have necessarily found every element necessary to convict the appellant of the lesser-included offense and if he had been convicted of the lesser-included at trial, whether there is sufficient evidence to support a conviction for that offense); *cf.* Tex. Penal Code Ann. § 21.11(a)(1), (c)(1).